187 P.3d 835 (2008)
STATE of Washington, Respondent,
v.
Kenith Earl TURNER, Appellant.
No. 59153-3-I.
Court of Appeals of Washington, Division 1.
July 21, 2008.
Eric J. Nielsen, Nielsen Broman & Koch PLLC, Seattle, WA, for Appellant.
James Morrissey Whisman, King County Prosecutor's Office, Seattle, WA, for Respondent.

OPINION PUBLISHED IN PART
SCHINDLER, C.J.
¶ 1 Kenith Earl Turner appeals his convictions for one count of rape of a child in the first degree and two counts of child molestation in the first degree. Turner claims the failure to electronically record the custodial police interrogation violated his right to due process under article I, section 3 of the Washington Constitution. Alternatively, Turner argues that even if the Washington Constitution, article 1, section 3, does not require the police to electronically record custodial interrogations, this court should follow the example of other states and require electronic recording under its supervisory authority. In State v. Spurgeon, 63 Wash. App. 503, 820 P.2d 960 (1991), this court held that the due process clause of the Washington Constitution does not require electronic recording of police interrogations and refused to adopt a rule requiring electronic recording. Because Turner cites no new developments *836 in Washington law, a Gunwdll[1] analysis does not require a different result and Turner fails to distinguish or to persuasively argue that our decision in Spurgeon is flawed, we affirm.

FACTS
¶ 2 In 2005, Nicole West, David Barber, and their three girls, nine-year-old twins K.B. and J.B. and six-year-old A.B., lived in an apartment complex in Enumclaw. Kenith Earl Turner lived across the hall with his wife and son. Turner is in his 70's and suffers from Guillain-Barrs Syndrome. Turner's legs are partially paralyzed and his fingers are bent at a 45 degree angle. Because of chronic pain in his legs, Turner takes pain medications and uses a motorized scooter. Turner would take J.B., K.B., and A.B. for rides on his scooter and gave them cookies, sodas, and gifts.
¶ 3 In October 2005, West moved out of the family's apartment but continued to live in the same apartment complex and saw the girls every day. In early November, K.B. told her mother that Turner had inappropriately touched her. West then separately asked J.B. and A.B. if either of the girls had anything they wanted to tell her about Turner. J.B. and A.B. each told their mother that Turner had inappropriately touched them. After West told Barber about the disclosures, he contacted the police.
¶ 4 A child interview specialist with the King County Prosecuting Attorney's Office, Ashley Wilske, interviewed each of the girls separately. J.B. told Wilske that Turner touched the inside of her private part more than five times and wiggled his fingers. J.B. said that while Turner was touching her, he told her not to tell anyone. Turner then asked J.B. to "touch his," but she refused. Another time, J.B. said that Turner grabbed her hand and placed it on his penis. J.B. also said that on another occasion, Turner pulled out his penis and tried to push her head towards it, but she moved her head away. K.B. told Wilske that Turner touched the outside of her vagina two different times when she was riding on the scooter K.B. said that when Turner touched her vagina, he asked her, "[d]oes it feel good?" She also said that Turner asked her to put her hand down his pants, but she refused to do so. A.B. said Turner touched her one time under her clothes but over her underwear.
¶ 5 After Wilske's interviews with the girls, the police arrested Turner. Turner's wife explained to the police that Turner had health problems and had to take a number of medications. She told the police he had to take one of the medications within the next hour.
¶ 6 Detective Grant McCall and Lieutenant Eric Sortland advised Turner of his Miranda[2] rights at the police station. Turner waived his rights and agreed to talk to the police. At first, Turner denied inappropriately touching the girls but then he admitted touching J.B. and K.B. However, he denied touching A.B. At some point during questioning, Turner's son delivered some pain medication, which the police allowed Turner to take. Detective McCall took notes during the interrogation and then typed a written statement from the notes. Turner then reviewed the statement. When Detective McCall asked Turner if he wanted to make any changes, he indicated that he did not and signed the statement.
¶ 7 In the statement, Turner admits touching K.B. on her vagina and inserting his finger into J.B.'s vagina numerous times but denies inappropriately touching A.B. or any other girls.
Over the last four to six months I have on many occasions touched in a sexual way [J.B.] and [K.B.]. I let both girls ride with me on my red motorized scooter on many occasions.
I touched [K.B.] with my hand and fingers between 6 and 7 times on the outside of her vagina under her panties. I touched her out in the driveway of the apartment complex, at Morning Star Church and one time at the basketball court over by the tall grass. When I touched [K.B.], I knew it was wrong. I *837 told [K.B.] not to tell anyone because I knew it was wrong and illegal.
I touched [J.B.] 8 to 10 times with my finger on her vagina under her panties. My finger went inside of [J.B.'s] vagina 8 to 10 times for a couple of seconds. My finger went inside of her vagina about )4 inch. I told [J.B.] not to tell anyone because I knew it was wrong and illegal.
I put [J.B.'s] hand on my penis one time and she touched me twice on her own. She saw my penis one time and I pushed her head down one time but she never sucked my penis.
Each time I touched the girls my cart was stopped somewhere on the apartment property or at the Morning Star Church or at the basketball court.[3] [J.B.] and [K.B.] were the only two girls I touched at the apartment. I did not touch any other children or girls.
¶ 8 The State charged Turner with one count of rape in the first degree of J.B. and two counts of child molestation in the first degree of K.B. and A.B.
¶ 9 Before trial, the court held a CrR 3.5 hearing to determine the admissibility of Turner's statements to the police. Detective McCall and Lieutenant Sortland testified that Turner was given his Miranda rights and waived them. Turner testified that he had trouble hearing and was not sure that the police read him the Miranda rights. While Turner initially denied signing the Miranda waiver form, he admitted the signature on the form was his. Turner also said that he did not read the statement and he only signed the statement because he was suffering from a sinus infection, he was confused from the pain medication he took, and the police told him he could go home if he signed the statement. Turner also said that when he asked for an attorney, the police gave him a cell phone but refused to help him use the phone. Detective McCall and Lieutenant Sortland testified that they did not make any threats or promises to Turner, that Turner never requested an attorney or medical assistance, and that Turner did not appear to be impaired.
¶ 10 Turner's primary physician, Dr. John Wicker, also testified about the pain medication. Dr. Wicker testified that in September 2005, Turner was taking very low doses of the pain medication to manage his pain. Dr. Wicker also testified that "any patient that's been on narcotics for a long period of time tend to become habituated to them and small amounts do not affect them at all. And it takes quite a large amount for them to have any pain relief, let alone any sedation from that."
¶ 11 The court ruled that Turner had made a knowing, voluntary, and intelligent waiver of his Miranda rights and the two-page written statement was admissible. The court expressly rejected Turner's account of the interrogation as not credible. The court concluded that Turner did not request an attorney, that the "[o]fficers did not mistreat him in any way in order to get him to give his statement," that "[a]ny medications which the defendant may have taken the day of his statement, either prior to or while giving it, did not impact his ability to understand the contents of his statement," and that Turner "had the mental acuity to know what was going on around him and reviewed his statement before signing it."
¶ 12 The defense theory at trial was that the girls made up the allegations against Turner in order to get their parents back together and that he was not physically capable of committing the alleged acts.
¶ 13 J.B., K.B., and A.B. testified at trial and their taped interviews with Wilske were admitted into evidence and played for the jury. J.B. testified that Turner touched her private parts and moved his fingers. K.B. said that Turner touched her on top of her clothes in her genital area. A.B. testified Turner touched her over her underwear in her genital area.
¶ 14 Turner's next door neighbor, Barbara Gizas, testified that she observed Turner touching one of the twins between her legs and on her bottom. Gizas testified that she saw Turner ask one of the twins if she wanted a ride on his scooter. Turner "had his face very close to [the girl's] face, he was *838 talking very quietly. And first he had his hands around her waist . . . [a]nd then his hands went to her butt." Gizas said the little girl, who was wearing a swim suit, got on Turner's lap. Turner then placed both his hands on the inside of the girl's thighs towards her crotch before driving away. On another occasion, while walking back from the store, Gizas said that she heard rustling noises in the bushes near the church and then saw Turner with one of the twins on his lap. When Turner saw Gizas, "he threw [the scooter] in reverse and both of their heads went  whipped back and went forward.'" Gizas also said that on another occasion she saw Turner drive his scooter down the middle of the road with A.B. on his lap before taking her behind a church and into the woods. On cross examination, Gizas admitted that she and Turner did not like each other and had filed complaints against each other with the apartment manager.
¶ 15 Turner testified at trial. Turner described his medical conditions and unequivocally denied inappropriately touching K.B., J.B., or A.B. Turner said the statements he made to the police were not true. Turner explained that he was sick with a sinus infection and on pain medication, and that he signed the statement because he wanted to go home. Detective McCall and Lieutenant Sortland testified in rebuttal and disputed Turner's account of the interrogation.
¶ 16 One of the jury instructions stated that in considering Turner's statement to the police, the jury should "give such weight and credibility to any alleged out-of-court statements as you see fit, taking into consideration the surrounding circumstances." The jury convicted Turner as charged of rape of a child in the first degree of J.B., and two counts of child molestation in the first degree of K.B. and A.B.

ANALYSIS
¶ 17 Turner argues the State violated his due process rights under article 1, section 3 of the Washington Constitution by not electronically recording his interrogation. Turner contends that an electronic recording would have resolved the issues of whether he waived his Miranda rights or asserted his right to an attorney, and whether he was impaired by the medication he took. Turner acknowledges that in State v. Spurgeon, 63 Wash.App. 503, 820 P.2d 960 (1991), this court held that the due process clause of the Washington Constitution, article 1, section 3, does not require police to electronically record custodial interrogations, but he argues that due process is an evolving standard. Turner contends that the state constitution provides greater due process protection than the federal due process clause and this court should interpret the state due process clause to require electronic recording of interrogations because of the role that false confessions play in wrongful convictions.
¶ 18 The federal constitution and the state constitution both guarantee citizens due process of law. The Fifth Amendment of the U.S. Constitution provides: "No person shall be . . . deprived of life, liberty, or property, without due process of law" and the Fourteenth Amendment states: "nor shall any state deprive any person of life, liberty, or property, without due process of law. . . ." Washington Constitution art. I, § 3 states: "No person shall be deprived of life, liberty, or property without due process of law."
¶ 19 It is well-established under federal law that the United States Constitution does not require electronic recording of custodial interrogations. See United States v. Coades, 549 F.2d 1303, 1305 (9th Cir.1977) (rejecting request that the court adopt a rule requiring confessions to police be recorded because "such a rule" is a matter for consideration by Congress); United States v. Tykarsky, 446 F.3d 458, 477 (3d Cir.2006) (it is clear that "recording of interrogations . . . is not mandated by the United States Constitution"); United States v. Montgomery, 390 F.3d 1013 (7th Cir.2004), cert. denied, 544 U.S. 968, 125 S.Ct. 1750, 161 L.Ed.2d 614 (2005) (recording of police interrogations is not "constitutionally required").
¶ 20 To determine whether the state due process clause provides greater protection than the federal Constitution with respect to the electronic recording of police interrogations, Washington courts analyze the six nonexclusive factors identified in *839 State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986). The six factors are: (1) the state provision's textual language; (2) significant differences; between the federal and state texts; (3) state constitutional and common law history; (4) existing state law; (5) structural differences between the federal and state constitutions; and (6) matters of particular state interest or local concern. Gunwall, 106 Wash.2d at 61-62, 720 P.2d 808.
¶ 21 In Spurgeon, this court addressed the same question presented here  whether the state constitution's due process clause mandates electronic recording of custodial interrogations  and concluded that none of the six Gunwall factors supported interpreting the state constitution differently from the federal Constitution. Spurgeon, 63 Wash. App. at 505-06, 820 P.2d 960. The court in Spurgeon concluded the first three factors did not support an independent interpretation because the language of the state Constitution and the federal Constitution is the same, "there is no contemporary record showing a broader meaning was intended by those adopting the Washington Constitution," and no legislative history that provided a justification for interpreting the provisions differently. Spurgeon, 63 Wash.App. at 506, 820 P.2d 960. In examining the fourth factor, preexisting state law, the court noted that Washington courts had not addressed the need to record interrogations, and looked instead to the closely analogous area of exclusion of evidence to conclude that the due process clause of the state constitution did not require electronic recording of police interrogations.[4]Spurgeon, 63 Wash.App. at 507-08, 820 P.2d 960. In reviewing the fifth and sixth factors, the court also concluded that structural distinctions did not suggest a more expansive interpretation, and that the fact that criminal law enforcement is primarily a function of state rather than the federal government did not mean that the level of protection should be different. Spurgeon, 63 Wash.App. at 506-07, 820 P.2d 960.
¶ 22 Turner argues that analysis of the fourth factor, preexisting state law, and the sixth factor, matters of particular state concern, support reaching a different result.[5]
¶ 23 As to the fourth factor, the only authority Turner cites in support of his argument that the state due process clause provides greater protection than the federal due process clause is State v. Bartholomew, 101 Wash.2d 631, 683 P.2d 1079 (1984), State v. Davis, 38 Wash.App. 600, 686 P.2d 1143 (1984), and the dissenting opinion in State v. Ortiz, 119 Wash.2d 294, 831 P.2d 1060 (1992). Turner's reliance on Davis, Bartholomew, and the dissent in Ortiz is misplaced. Bartholomew and Davis do not address the question of whether the state constitution requires police to electronically record interrogations, and were decided before Gunwall. In Bartholomew, the court held due process requires that the rules of evidence must apply in a capital sentencing proceeding. Bartholomew, 101 Wash.2d at 638-639, 683 P.2d 1079.[6] In Davis the court held that, unlike the federal Constitution, our state constitution does not allow testimony about a defendant's post-arrest silence even if the defendant *840 did not receive Miranda warnings. Davis, 38 Wash.App. at 606, 686 P.2d 1143.
¶ 24 In Ortiz, the majority concluded that the defendant's state constitutional due process rights were not violated by the State's failure to preserve evidence.[7] The dissent argued that the defendant's rights were violated by destruction of the evidence and that a Gunwall analysis "supports independent interpretation of our own due process clause." Ortiz, 119 Wash.2d at 320, 831 P.2d 1060 (Johnson, J, dissenting). However, in a case decided after Ortiz, State v. Wittenbarger, 124 Wash.2d 467, 481, 880 P.2d 517 (1994), the court definitively addressed the question of whether the state due process clause provides greater protection than the federal constitution for preservation of evidence, and held that it does not.
Today, after consideration of the six factors set out in State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986), we hold that the state due process clause affords the same protection regarding a criminal defendant's right to discover potentially exculpatory evidence as does its federal counterpart.
Wittenbarger, 124 Wash.2d at 474, 880 P.2d 517. Because the state due process clause does not require greater protection for the preservation of evidence, there is no basis to interpret the due process clause to impose a duty to record interrogations.
¶ 25 As to the sixth Gunwall factor, Turner cites Heinemann v. Whitman County, 105 Wash.2d 796, 718 P.2d 789 (1986), to argue that preventing police from engaging in deceptive and coercive practices is of particular concern in Washington. Turner's reliance on Heinemann is misplaced. While preventing deceptive and coercive interrogations is a purpose for requiring Miranda warnings, Heinemann does not require electronic recording of interrogations to prevent such practices. We conclude Heinemann does not support expanded due process protection.
¶ 26 In sum, Turner does not cite any authority or developments in Washington law to support reaching a different result under Gunwall.[8] Moreover, in a number of cases decided after Spurgeon, the court has repeatedly rejected the argument that the state due process clause provides greater protection than the federal due process clause. In re Pers. Restraint of Dyer, 143 Wash.2d 384, 394, 20 P.3d 907 (2001) ("Washington's due process clause does not afford a broader due process protection than the Fourteenth Amendment"); In re Pers. Restraint of Matteson, 142 Wash.2d 298, 310, 12 P.3d 585 (2000) (rejecting the claim that state due process rights are greater than federal due process rights because "there are no material differences between the state and federal due process clauses. . . .'"); State v. Manussier, 129 Wash.2d 652, 679, 921 P.2d 473 (1996) ("The Gunwall factors do not favor an independent inquiry under article I, section 3 of the state constitution").[9] Because *841 Turner cannot show that the analysis in Spurgeon is flawed, we reject Turner's argument that article I, section 3 requires electronic recording of custodial police interrogations.
¶ 27 Alternatively, Turner argues that even if there is no due process right under the Washington Constitution to require police to electronically record interrogations, this court should deviate from Spurgeon and follow the example of Wisconsin and Minnesota by exercising its supervisory authority and adopt a rule excluding evidence from interrogations that are not electronically recorded.
¶ 28 In In re Jerrell C.J., 283 Wis.2d 145, 699 N.W.2d 110 (2005), the Wisconsin court exercised is supervisory authority to adopt a rule on the admissibility of juvenile confessions, noting the special susceptibility of minors to police pressure. Jerrell, 699 N.W.2d at 117. In State v. Scales, 518 N.W.2d 587 (Minn.1994), the Minnesota court declined to reach the question of whether the state due process clause required recording police interrogations, but the court imposed a requirement to do so after years of warning law enforcement that it was necessary. Scales, 518 N.W.2d at 592.[10] Here, Turner is not a juvenile nor is this a situation where police have repeatedly ignored warnings by Washington courts.
¶ 29 Turner also argues that awareness of the role of false confessions has increased since Spurgeon was decided in 1991, and that electronic recording would deter police coercion, reduce litigation over suppression hearings, protect officers accused of improper tactics, and improve interrogation techniques. Turner cites a law review article that documents proven false confessions. Steven A. Drizin and Richard A. Leo, The Problem of False Confessions in the Post-DNA World, 82 N.C. L.Rev. 891, 932 (2004). Turner also cites another law review article that argues false confessions induced by standard interrogation methods are most likely to occur when the police are certain the suspect is guilty or have no other suspects. Welsh S. White, False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions, 32 Harv. C.R.C.L. L.Rev. 105 (1997).
¶ 30 While the policy arguments in the law review articles are worthy of consideration, either the legislature or the supreme court in' its rule making capacity is in a better position to resolve these policy questions.[11] We also agree with the observation in Spurgeon that:
. . . such a sweeping change in longstanding police practice should be made only after a full hearing of all the policy and financial implications and with adequate advance notice to law enforcement in the form of the adoption of a rule of evidence or a statute mandating recording.
Spurgeon, 63 Wash.App. at 508, 820 P.2d 960.
¶ 31 We hold that Spurgeon controls. The State did not violate Turner's due process rights under article I, section 3 of the Washington Constitution by failing to electronically record the custodial interrogation.
¶ 32 Because the remainder of this opinion has no precedential value, it will be filed for *842 public record in accordance with the rules governing unpublished opinions.
WE CONCUR: COX and GROSSE, JJ.
NOTES
[1] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).
[3] Exhibit 3.
[4] In reaching the conclusion that Washington's constitution did not require recording police interrogations, the court also specifically distinguished the Alaska court's decision in Stephan v. State, 711 P.2d 1156 (Ak.1985). In Stephan the court held that Alaska's constitution required electronic recording of police interrogations. Spurgeon, 63 Wash.App. at 507-08, 820 P.2d 960. Because the Alaska constitution requires preservation of breathalyzer evidence, but Washington's constitution does not, the court concluded that Washington law "regarding preservation of breathalyzer samples, being contrary to Alaska's, is a strong indication that our constitution does not require tape recorded interrogations." Spurgeon, 63 Wash.App. at 508, 820 P.2d 960.
[5] In relation to the third Gunwall factor Turner also cites the Journal of the Washington Constitutional Convention, 1889 at 497, (B. Rosenow, ed. 1962). But the lack of debate further supports the conclusion that the framers intended to adopt the well-known federal due process provisions. And our supreme court recently concluded that "`no legislative history has been shown which would provide a justification for interpreting the identical [due process] provisions differently.'" In re Pers. Restraint of Matteson, 142 Wash.2d 298, 310, 12 P.3d 585 (2000).
[6] In addition, the Bartholomew court based its decision on the federal constitution, relying on the Washington constitution only as an alternative basis. Bartholomew, 101 Wash.2d at 639, 683 P.2d 1079.
[7] Ortiz is a plurality decision. Four justices concluded that state and federal due process is coextensive. Ortiz, 119 Wash.2d at 304, 831 P.2d 1060. The fifth justice concurred in the result but decided that the issue of whether state and federal due process protections are identical need not be reached because the result was the same under either the federal or the state due process provisions. Ortiz, 119 Wash.2d at 315, 831 P.2d 1060 (Dolliver, J. concurring).
[8] In addition, Turner does not address RCW 9.73.090(1)(b) relating to the recording of custodial interrogations, which does not require recording custodial interrogations.
[9] Alaska remains the only state to hold that its constitution requires electronic recording of police interrogations. Every other court that has addressed the same question since Spurgeon has rejected arguments to require electronic recording of custodial interrogations on state constitutional grounds. See People v. Holt, 15 Cal.4th 619, 63 Cal.Rptr.2d 782, 937 P.2d 213, 242 (1997); People v. Casias, 59 P.3d 853, 857 (Colo. 2002); State v. James, 237 Conn. 390, 678 A.2d 1338, 1360 (1996); Coleman v. State, 189 Ga. App. 366, 375 S.E.2d 663, 664 (1988); State v. Kekona, 77 Hawai`i 403, 886 P.2d 740, 746 (1994); State v. Rhoades, 119 Idaho 594, 809 P.2d 455, 462 (1991); Gasper v. State, 833 N.E.2d 1036, 1041 (Ind.App.2005); State v. Morgan, 559 N.W.2d 603, 609 (Iowa 1997); State v. Speed, 265 Kan. 26, 961 P.2d 13, 24 (1998); Brashars v. Commonwealth, 25 S.W.3d 58, 63 (Ky.2000); State v. Thihodeaux, 750 So.2d 916, 923 (La.1999); State v. Buzzell, 617 A.2d 1016, 1018-19 (Me.1992); Baynor v. State, 355 Md. 726, 736 A.2d 325, 332 (1999); Commonwealth v. Fryar, 414 Mass. 732, 610 N.E.2d 903, 909 n. 8 (1993); People v. Fike, 228 Mich.App. 178, 577 N.W.2d 903, 906-07 (1998); Williams v. State, 522 So.2d 201, 208 (Miss. 1988); Jimenez v. State, 105 Nev. 337, 775 P.2d 694, 697 (1989); State v. Bamett, 147 N.H. 334, 789 A.2d 629, 632 (2001); State v. Cook, 179 N.J. 533, 847 A.2d 530, 545 (2004); People v. Falkenstein, 288 A.D.2d 922, 732 N.Y.S.2d 817, 818-19 (2001); State v. Thibodeaux, 341 N.C. 53, 459 S.E.2d 501, 507 (1995); State v. Goebel, 725 N.W.2d 578, 584 (N.D.2007); State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 686 (1997); Commonwealth v. Craft, 447 Pa.Super. 371, 669 A.2d 394, 397 (1995); State v. Godsey, 60 S.W.3d 759, 771 (Tenn.2001); State v. James, 858 P.2d 1012, 1018 (Utah Ct.App.1993); State v. Gorton, 149 Vt. 602, 548 A.2d 419, 422 (1988); State v. Kilmer, 190 W.Va. 617, 439 S.E.2d 881, 893 (1993).
[10] Minnesota and Wisconsin remain the only states to exercise judicial supervisory authority to require electronic recording of custodial interrogations, although New Hampshire has judicially restricted the admissibility of recordings where the entire interrogation was not recorded. State v. Bamett, 147 N.H. 334, 789 A.2d 629, 632-33 (2001).
[11] RCW 9.73.090 addresses electronic recording of police interrogations and prohibits recording without consent.