

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
) DIVISION ONE
          Respondent, )
) No. 70296-3-I
          v. )
) UNPUBLISHED OPINION
STEPHEN AUGUST HAFF, )
)
          Appellant. ) FILED: February 23, 2015
_____ )

DWYER, J. — Following a jury trial, Stephen Haff was convicted of robbery in the first degree. On appeal, Haff contends both that the evidence presented at trial was insufficient to establish that he committed robbery "within" a financial institution and that his right to due process was violated when an eyewitness was permitted to identify him at trial. Because the evidence adduced at trial was sufficient to support the jury's verdict and because the eyewitness identification was properly admitted, we affirm.

I

U.S. Bank had a branch located inside an Albertsons grocery store in north Marysville. The branch consisted of a vault room, an office, an ATM, and three teller lines. Customers in the teller lines were separated from the bank employees by a counter.

On August 9, 2011, Casey Montgomery and Tyson Farley were both working at the U.S. Bank branch when a tall, slim white man with short facial hair, who was wearing a dark jacket and a dark baseball cap, entered a teller line and

approached the counter in front of Montgomery. The man dropped a note[1] in front of Montgomery and then placed his hands on the counter and waited. After Montgomery read the note, he handed the man the money in his cash register. The man took the money and walked away. The encounter lasted approximately 20 seconds and was captured on video.

Once the man had gone, Montgomery pulled the alarm and called the police. Montgomery and Farley later each gave a statement to the police recounting the robbery and describing the robber. The note was also collected and examined for fingerprints. Prints matching Haff's left thumb and index finger were identified on the note.

On August 17, 2011, Detective Corey Shackleton of the Marysville Police Department presented a photomontage of six photographs, including one of Haff, to Montgomery and Farley, separately. Montgomery did not identify anyone in the photographs as the robber. Farley identified Haff as the robber and stated that he was 70 percent certain.

Still images from the surveillance footage of the robbery were presented to Allen, Kelly, and Daniel Stickney, with whom Haff had been living around the time of the robbery. Each of them identified Haff as the man in the images. A dark baseball cap, resembling the one worn by the robber, was also discovered on

---

[1] The note said:
My partner is in the parking lot with a police radio. If you hit the alarm, he will know and start shooting. I am armed as well. You have 30 seconds to get me a hundred thousand dollars in $100 bills. No marked bills, dye packs, or tracking devices. You can call the cops 5 minutes after I leave. If you call before then, my partner will know and start shooting. Give me this note back. Your time starts now!

Allen and Kelly Stickney's property. Haff's DNA was later identified on the hat. Additionally, a letter that Haff attempted to have delivered to Daniel Stickney, in which Haff indicated that Stickney had helped him plan the robbery, was given to a corrections officer by a jailhouse informant.

On September 7, 2011, Haff was charged with robbery in the first degree. Haff filed a motion to suppress evidence of Montgomery's and Farley's photomontage identifications and to prohibit them from identifying Haff in court. At a pretrial hearing, the trial court heard testimony and reviewed the photomontages presented to Montgomery and Farley as well as the descriptions they provided to the police immediately after the robbery. The court ruled that the photomontages were not unduly suggestive and that the State could ask the eyewitnesses whether they could identify the robber at trial.[2]

At trial, both Montgomery and Farley identified Haff as the robber. Montgomery said he was 100 percent certain. Farley continued to say he was 70 percent sure. The jury convicted Haff as charged, and he was sentenced to 48 months in prison. Haff now appeals.

II

Haff contends that insufficient evidence supports the jury's verdict of guilt.

---

[2] At this hearing, defense counsel acknowledged the lack of case law support for his assertion that the witnesses should be prohibited from making identifications at trial.
The exchange was as follows:
> The Court: . . . I also wanted to ask you if – I'm not aware of authority that says that – and maybe I've missed it – authority that says that regardless of what took place during the photomontage procedure, that the State is not allowed to at least attempt to – or at least find out whether a witness in court can make an identification in court. Is there a case that says that the State is not even allowed to try?
> [Defense Counsel]: No, your Honor . . . No, there isn't any caselaw.

This is so, he asserts, because the State did not establish that the robbery was committed "within" a bank, as required by statute. His contention is unavailing.

The due process clauses of the federal and state constitutions require that the State prove every element of a crime beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3. "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). Circumstantial evidence and direct evidence can be equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the jury on questions of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Killingsworth, 166 Wn. App. 283, 287, 269 P.3d 1064 (2012).

"Our primary duty in interpreting a statute is to discern and implement legislative intent." Johnson v. Recreational Equip., Inc., 159 Wn. App. 939, 946, 247 P.3d 18 (2011) (citing Dep't of Ecology v. Campbell & Gwinn, LLC, 146

Wn.2d 1, 9, 43 P.3d 4 (2002). If a "statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." Campbell & Gwinn, 146 Wn.2d at 9-10. "The plain meaning of a statute may be discerned 'from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question.'" State v. J.P., 149 Wn.2d 444, 450, 69 P.3d 318 (2003) (quoting Campbell & Gwinn, 146 Wn.2d at 11). While we may, in seeking to perceive the plain meaning of a statute, examine "the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole," State v. Engel, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009), we "must not add words where the legislature has chosen not to include them," and "must construe statutes such that all of the language is given effect." Rest. Dev., Inc. v. Cananwill, Inc., 150 Wn.2d 674, 682, 80 P.3d 598 (2003). The court must avoid absurd results when interpreting statutes. J.P., 149 Wn.2d at 450; State v. Liden, 138 Wn. App. 110, 117, 156 P.3d 259 (2007).

Haff was charged with robbery in the first degree. "A person commits robbery when he . . . unlawfully takes personal property from the person of another . . . against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his . . . property." RCW 9A.56.190. "A person is guilty of robbery in the first degree if: . . . He or she commits a robbery within and against a financial institution as defined in RCW 7.88.010 or RCW 35.38.060." RCW 9A.56.200(1)(b).

Per RCW 35.38.060, "'Financial institution[]' . . . means a branch of a bank

- 5 -

engaged in banking in this state . . . and any state bank or trust company, national banking association, stock savings bank, mutual savings bank, or savings and loan association."[3] The definition includes all branches of any qualifying bank. It is not limited, for example, by the type of space the branch occupies—whether it has its own freestanding building or shares space with another business.

There is no dispute that the robbery herein was committed against the U.S. Bank branch or that the branch meets the definition of "financial institution." The only issue is whether the robbery occurred "within" the bank branch.[4] The ordinary meaning of "within" is no surprise; it means "in the inner or interior part of : inside of."[5] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2627 (2002). It is plainly possible to be within one space that is itself located within a second space—for example, a store within a mall or a bank within a grocery store. Moreover, as noted above, the statutory definition of "financial institution" includes any branch of a qualifying bank; it is not limited based on the type of space the branch occupies. Therefore, the plain meaning of the relevant statutes supports the conclusion that it is possible for robbery in the first degree to be committed against a bank that is located within a grocery store.

The narrow question in this case, then, becomes whether sufficient

---

[3] RCW 7.88.010(6) provides: "'Financial institution' means a bank, trust company, mutual savings bank, savings and loan association, or credit union authorized by federal or state law to accept deposits in this state."

[4] Given the holding of State v. Liden, 138 Wn. App. at 119, that "the legislature did not intend to require the State to provide direct evidence that a robbed bank is a 'financial institution,' certified or otherwise; assuming its sufficiency, circumstantial evidence will suffice," we deem it unnecessary to address whether it must be proved by direct evidence.

[5] Haff argues that "within" also indicates "enclosure or containment," Appellant's Br. at 8, and so it does. However, a bounded space need not be demarcated by brick and mortar.

evidence was presented at trial that the robbery at issue was, in fact, committed within the U.S. Bank branch located within the Marysville Albertsons grocery store. The evidence adduced at trial established the following: In August 2011, U.S. Bank had a branch located in the north Marysville Albertsons store. The branch consisted of three teller lines, an office, a vault room, and an ATM. On August 9, 2011, Montgomery and Farley were working at that U.S. Bank branch when Haff entered a teller line, walked up to the counter, dropped a note in front of Montgomery, placed his hands on the counter, and waited for Montgomery to respond. After reading the note, Montgomery handed Haff the cash from his drawer. Haff then walked away. This evidence is sufficient to support a finding that Haff committed the robbery within the U.S. Bank.

III

Haff next contends that Montgomery's in-court identification of Haff as the robber violated the federal due process clause.[6] This is so, he asserts, because the in-court identification procedure itself was unduly suggestive and Montgomery's identification was unreliable—despite the fact that, on appeal, he does not allege any improper police conduct affecting the identification. Haff's position is foreclosed by the United States Supreme Court's decision in Perry v. New Hampshire, __ U.S. __, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012).

Perry pertains to the established "due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the

---

[6] "[N]or shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV.

perpetrator of a crime." 132 S. Ct. at 720.

In Perry, the Court addressed the question of "whether the Due Process Clause requires a trial judge to conduct a preliminary assessment of the reliability of an eyewitness identification made under suggestive circumstances not arranged by the police." 132 S. Ct. at 723. The Court held "that the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." 132 S. Ct. at 730.

The Court explained that the due process clause is only implicated when there is improper police conduct. As it summarized: "We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers." Perry, 132 S. Ct. at 720-21. The Court then reiterated,

> When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

Perry, 132 S. Ct. at 721.

As the Court explained, Perry asserted that "[t]he rationale underlying our decisions . . . supports a rule requiring trial judges to prescreen eyewitness evidence for reliability any time an identification is made under suggestive circumstances." Perry, 132 S. Ct. at 725. In rejecting this contention, the Court

- 8 -

reiterated the importance of improper police conduct to its prior decisions.

> The due process check for reliability, Brathwaite[7] made plain, comes into play only after the defendant establishes improper police conduct. The very purpose of the check, the [Brathwaite] Court noted, was to avoid depriving the jury of identification evidence that is reliable, *notwithstanding* improper police conduct.

Perry, 132 S. Ct. at 726. Moreover, Perry's contention "ignore[d] a key premise of the Brathwaite decision: A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances, the Court said, is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place." Perry, 132 S. Ct. at 726.

The Perry Court viewed its holding as being consistent with its decision in Coleman v. Alabama, 399 U.S. 1, 90 S. Ct. 1999, 26 L. Ed. 2d 387 (1970), which, the Supreme Court explained, "similarly shows that the Court has linked the due process check, not to suspicion of eyewitness testimony generally, but only to improper police arrangement of the circumstances surrounding an identification." Perry, 132 S. Ct. at 726.

The Court identified some of the risks associated with adopting Perry's position. As the Court observed, "[Perry's] position would open the door to judicial preview, under the banner of due process, of most, if not all, eyewitness identifications," and "[t]o embrace Perry's view would . . . entail a vast enlargement of the reach of due process as a constraint on the admission of evidence." Perry, 132 S. Ct. at 727. Moreover, the Court noted that it could not avoid these consequences by adopting Perry's suggestion "that the Court . . .

---

[7] Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

limit the due process check he proposes to identifications made under 'suggestive circumstances.'" Perry, 132 S. Ct. at 727. This would not solve the problem because, as the Court explained,

> Even if we could rationally distinguish suggestiveness from other factors bearing on the reliability of eyewitness evidence, Perry's limitation would still involve trial courts, routinely, in preliminary examinations. Most eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do.

Perry, 132 S. Ct. at 727. Thus, the Court plainly acknowledged the inherent suggestiveness of in-court identifications but nevertheless reiterated that suggestiveness alone does not implicate due process guaranties.

The Court also explained the rationale for its position:

> Our unwillingness to enlarge the domain of due process as Perry and the dissent urge rests, in large part, on our recognition that the jury, not the judge, traditionally determines the reliability of evidence. See supra, at 723-724.[8] We also take account of other safeguards built into our adversary system that caution juries

---

[8] As the Court explained earlier in the opinion:

The Constitution, our decisions indicate, protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit. Constitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment rights to counsel, Gideon v. Wainwright, 372 U.S. 335, 343-345, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); compulsory process, Taylor v. Illinois, 484 U.S. 400, 408-409, 108 S. Ct. 646, 98 L.Ed.2d 798 (1988); and confrontation plus cross-examination of witnesses, Delaware v. Fensterer, 474 U.S. 15, 18-20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985) (per curiam). Apart from these guarantees, we have recognized, state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial. See Kansas v. Ventris, 556 U.S. 586, 594, n.*, 129 S. Ct. 1841, 173 L. Ed. 2d 801 (2009) ("Our legal system . . . is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses."). Only when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice," Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990) (internal quotation marks omitted), have we imposed a constraint tied to the Due Process Clause. See, e.g., Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959) (Due process prohibits the State's "knowin[g] use [of] false evidence," because such use violates "any concept of ordered liberty.").

Perry, 132 S. Ct. at 723-724.

- 10 -

> against placing undue weight on eyewitness testimony of questionable reliability. These protections include the defendant's Sixth Amendment right to confront the eyewitness. See Maryland v. Craig, 497 U.S. 836, 845, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant."). Another is the defendant's right to the effective assistance of an attorney, who can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments. Eyewitness-specific jury instructions, which many federal and state courts have adopted, likewise warn the jury to take care in appraising identification evidence. See, e.g., United States v. Telfaire, 469 F.2d 552, 558-559 (C.A.D.C. 1972) (per curiam) (D.C. Circuit Model Jury Instructions) ("If the identification by the witness may have been influenced by the circumstances under which the defendant was presented to him for identification, you should scrutinize the identification with great care."). See also Ventris, 556 U.S., at 594, n.*, 129 S. Ct. 1841 (citing jury instructions that informed jurors about the unreliability of uncorroborated jailhouse-informant testimony as a reason to resist a ban on such testimony);[9] Dowling, 493 U.S., at 352–353, 110 S. Ct. 668.[10] The constitutional requirement that the government prove the defendant's guilt beyond a reasonable doubt also impedes convictions based on dubious identification evidence.

Perry, 132 S. Ct. at 728-29 (footnote omitted).

These constitutional protections are supplemented by additional state and federal protections:

> State and federal rules of evidence, moreover, permit trial judges to exclude relevant evidence if its probative value is substantially outweighed by its prejudicial impact or potential for misleading the jury. See, e.g., Fed. Rule Evid. 403; N.H. Rule Evid. 403 (2011). See also Tr. of Oral Arg. 19-22 (inquiring whether the standard Perry seeks differs materially from the one set out in Rule 403). In appropriate cases, some States also permit defendants to present expert testimony on the hazards of eyewitness identification evidence. See, e.g., State v. Clopten, 2009 UT 84, A33, 223 P.3d 1103, 1113 ("We expect . . . that in cases involving eyewitness identification of strangers or near-strangers, trial courts

---

[9] Kansas v. Ventris, 556 U.S. 586, 594, n.*, 129 S. Ct. 1841, 173 L. Ed. 2d 801 (2009).
[10] Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990).

will routinely admit expert testimony [on the dangers of such evidence].").

Perry, 132 S. Ct. at 729.

Many of the safeguards discussed by the Perry Court were at work in Haff's trial. Haff was represented by an attorney who provided effective assistance. Moreover, that attorney cross-examined Montgomery, exposing potential flaws in his testimony:

Q    Mr. Montgomery, good afternoon.
     You were on duty as a teller that day at the Albertson's. We've established that; correct?
A    Correct.
Q    How far was Mr. Haff, as you identified today, how far was the person away from you when you were doing the transaction?
A    Maybe a couple of feet.
Q    Okay. And how long a time period did it take for you to get the money and hand it to him?
A    Probably about 20 seconds.
Q    Okay. And you looked at a montage how long after that?
A    A few days. I'm not personally sure how many days.
Q    But fairly soon?
A    Yes.
Q    And you could not pick out anybody from that six-person montage; correct?
A    Correct.
Q    Did you say on your original testimony that he had scruffy hair on his face?
A    Yeah. It was really, really short.
Q    So he had facial hair?
A    A little bit, yes.
Q    What kind of facial hair did you say?
A    It was just, like, scruffy, just a little --
Q    Scruffy beard?
A    Yeah. Really thin beard.
Q    Okay. Does --
A    Like a 5:00 shadow.
Q    Does Mr. Haff have that on today?
A    No.
Q    How far away is Mr. Haff from you right now?
A    20 feet or so.
Q    All right. This was August 9 of 2010 or '11?

- 12 -

A    '10. Yeah, '10.
No, '11. I'm sorry. A year and a half ago, so, yeah.
Q    Now, you come to court today, and how often have you looked at the montage or any pictures of Mr. Haff?
A    How often have I?
Q    Yes.
A    It's been awhile.
Q    Now you're, what, 20, 30 feet away, and all of a sudden that individual in the defendant's chair, you now identify him; is that correct?
A    Yes.
Q    100 percent certain?
A    Yes.
Q    You couldn't pick him out before?
A    I could not.
Q    Who else is sitting at that table there?
A    I don't know their names, unfortunately.
Q    Have you ever interacted with Detective Vinson?
A    He looks familiar. He was there that day. There was a lot of officers in and out of the office.
Q    Ever been questioned by Mr. Dickinson?
A    I met him for the first time today.
Q    Okay. Then there's me.
A    Uh-huh.
Q    Then there's one other person at the table, isn't there --
A    Yes.
Q    -- sitting in the defendant's chair?
A    Uh-huh..
Q    Thank you.

This is the constitutionally protected means by which Haff was empowered to contest the government's case—"not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." Perry, 132 S. Ct. at 723. The admission of Montgomery's testimony identifying Haff as the robber did not violate the protections of the Fourteenth Amendment due process clause.

The United States Supreme Court's decision in Perry is entirely consistent with the Washington Supreme Court's opinion in State v. Vaughn, 101 Wn.2d

604, 607-08, 682 P.2d 878 (1984), decided almost three decades earlier.

Vaughn appealed his two robbery convictions, alleging that the robbery victims' "unreliable" in-court identification testimony, declaring him to be the robber, violated his right to due process of law. Our Supreme Court affirmed the convictions, holding that "where, as here, there is no allegation that impermissibly suggestive identification procedures were utilized, the due process clause does not condition the admissibility of identification testimony upon proof of its reliability." Vaughn, 101 Wn.2d at 605. As in Perry, the analysis in Vaughn turned on whether the in-court identifications were "based upon suggestive identification procedures." Vaughn, 101 Wn.2d at 609. Because Vaughn did not allege "that either the pretrial or the in-court identifications were tainted by any suggestive identification procedures," there was "no need to assess the reliability of [the eyewitnesses'] identification testimony." Vaughn, 101 Wn.2d at 608. The admission of the victims' testimony, the court held, was proper.

Similarly, the admission of Montgomery's testimony in Haff's trial did not violate the protections of the federal due process clause.

IV

Haff next contends that the Washington Constitution's due process clause[11] should be applied so as to prohibit eyewitness testimony of the type herein challenged. We disagree.

Haff asserts that Vaughn does not control the outcome of this claim because the holding in Vaughn was premised upon the Fourteenth Amendment,

_____

[11] "No person shall be deprived of life, liberty, or property, without due process of law." WASH. CONST. art. I, § 3.

- 14 -

not on article I, section 3. It is true that the <u>Vaughn</u> court did not specify whether its holding was based on the state or federal due process clause and that, instead, the case refers generally to "the due process clause." <u>Vaughn</u>, 101 Wn.2d at 605. The opinion also relies heavily upon the United States Supreme Court's <u>Brathwaite</u> decision. <u>See</u> <u>Vaughn</u>, 101 Wn.2d at 607-09. Given the absence of clarity, we must analyze the factors enumerated in <u>State v. Gunwall</u>, 106 Wn.2d 54, 720 P.2d 808 (1986), to determine whether the Washington Constitution extends broader or different rights than its federal counterpart.

The six <u>Gunwall</u> factors are: (1) the state provision's textual language; (2) significant differences between the federal and state texts; (3) state constitutional and common law history; (4) existing state law; (5) structural differences between the federal and state constitutions; and (6) matters of particular state interest or local concern. 106 Wn.2d at 61-62. "[These factors] are to be used in evaluating a specific claim and not all of them will be relevant to every case." <u>State v. Spurgeon</u>, 63 Wn. App. 503, 505, 820 P.2d 960 (1991).[12]

The first and second factors weigh against an independent interpretation under the Washington Constitution. As Haff concedes, the text of the two provisions is nearly identical. The Fourteenth Amendment states: "nor shall any state deprive any person of life, liberty, or property, without due process of law." Washington Constitution article I, section 3, states: "No person shall be deprived of life, liberty, or property, without due process of law." "[B]ecause the language of the state constitution and the federal constitution is the same," neither the first

---

[12] Haff contends that the State conceded error on this issue by failing to present a responsive argument in its merits brief. It is true that the State—inexplicably—failed to respond to Haff's contention. Nevertheless, given the nature of Haff's claim, we must evaluate its merits.

nor the second Gunwall factors favor an independent state interpretation. State v. Turner, 145 Wn. App. 899, 908, 187 P.3d 835 (2008); accord Spurgeon, 63 Wn. App. at 505-06.

As to the third Gunwall factor—state constitutional and common law history—we agree with Haff's concession that: "[T]here does not appear to be any legislative history from the constitutional convention that sheds light on whether the state due process clause should be interpreted differently from the federal one." Appellant's Br. at 20. This concession is consistent with our prior observation that: "'[T]here is no contemporary record showing a broader meaning was intended by those adopting the Washington Constitution,' and no legislative history that provided a justification for interpreting the provisions differently." Turner, 145 Wn. App. at 908 (quoting Spurgeon, 63 Wn. App. at 506).

Factor five of the Gunwall analysis calls for us to examine the structural difference between the federal and state constitutions. Gunwall, 106 Wn.2d at 61-62. The structural difference between the federal and state constitutions is apparent. Where the federal constitution is a grant of enumerated powers, the state constitution serves to limit the sovereign power, which directly lies with the residents and indirectly lies with the elected representatives. Gunwall, 106 Wn.2d at 62-63. However, as this court has also explained: "[T]his historical fact is present in every case. A citizen's right to due process is equally important and valid against a government of limited power as against one of general power." Spurgeon, 63 Wn. App. at 506. Thus, "this difference is a nonfactor here." State

v. Martin, 151 Wn. App. 98, 115, 210 P.3d 345 (2009), aff'd on other grounds by 171 Wn.2d 521, 252 P.3d 872 (2011).

As to the sixth Gunwall factor, Haff states broadly: "state law enforcement measures are a matter of state or local concern, as is the fundamental fairness of trials held in this state," Appellant's Br. at 22, but he does not cite any authority suggesting that Washington has a particular concern in limiting in-court identifications by eyewitnesses. Once again, this court has noted that

> the fact that criminal law enforcement is primarily a function of state government rather than the national government is true for every criminal case. Although a Washington citizen is more likely to come in contact with the criminal law in the Washington courts rather than the federal courts, that does not mean that the quantum of protection should be different.

Spurgeon, 63 Wn. App. at 507. Moreover, "it might be argued that every provision of the state constitution is a matter of particular state concern. But if that were, by itself, reason to embark on an independent analysis, the entire Gunwall framework would be rendered superfluous. Martin, 151 Wn. App. at 115-16.

The only real point of contention in the Gunwall analysis is factor four. This factor directs examination of preexisting state law, which "may be responsive to concerns of its citizens long before they are addressed by analogous constitutional claims."[13] Gunwall, 106 Wn.2d at 62. This factor requires us to

---

[13] The federal due process clause has applied to Washington since statehood, which postdated passage of the Fourteenth Amendment. Thus, unlike, for instance, search and seizure law, in which the Fourth Amendment was not held to apply fully to the states until 1961, see Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (making the exclusionary rule, the remedy for search and seizure violations, applicable to the states through the due process clause of the Fourteenth Amendment), and Wolf v. Colorado, 338 U.S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949) (making the right against unreasonable search and seizure applicable to the states

consider the degree of protection that Washington has historically given in similar situations. Gunwall, 106 Wn.2d at 61-62.

The primary case Haff cites in support of his contention that preexisting law weighs in favor of an independent analysis is State v. Bartholomew, 101 Wn.2d 631, 683 P.2d 1079 (1984) [hereinafter Bartholomew II].[14] As a preliminary matter, this case is not, in fact, preexisting law. Bartholomew II was filed approximately seven years after Brathwaite, the principal United States Supreme Court case defining the due process check for reliability of in-court identifications, and the same day as Vaughn, the principal Washington Supreme Court case applying Brathwaite in this state. In any event, Bartholomew II does not stand for the proposition for which Haff cites it.

In State v. Bartholomew, 98 Wn.2d 173, 654 P.2d 1170 (1982), the court held that certain provisions of Washington's death penalty statute violated the federal due process clause because they permitted consideration of any relevant evidence at the trial's penalty phase regardless of its reliability. The United States Supreme Court vacated the judgment and remanded the case for reconsideration in light of its decision in Zant v. Stephens, 462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983). On remand, our Supreme Court again held

---

through the due process clause of the Fourteenth Amendment), there was no period of time during which the provisions of the Fourteenth Amendment did not protect individual Washingtonians.

[14] Haff also refers to the dissenting opinion in In re Marriage of King, 162 Wn.2d 378, 174 P.3d 659 (2007). That opinion cites Bartholomew II in support of the proposition that "precedent exists for the premise that in some contexts an independent analysis applies under article I, section 3." King, 162 Wn.2d at 414. The applicability of Bartholomew II to the specific question presented herein is discussed above. To the extent that Haff attempts to offer King for something more than the dissent's characterization of Bartholomew II, his effort fails. The issue in King was the right to counsel in certain civil cases, a far cry from the issue presented herein—the admissibility at trial of certain eyewitness testimony in criminal cases. Thus, the King dissent does not provide an answer to the issue advanced herein.

that due process requires that the rules of evidence must apply in a capital sentencing proceeding.

> We deem particularly offensive to the concept of fairness a proceeding in which evidence is allowed which lacks reliability. The rules of this court concerning admissibility of evidence are premised on allowing evidence which is trustworthy, reliable, and not unreasonably prejudicial. See ER 403. The purpose of the rules of evidence is to afford any litigant a fair proceeding. See ER 102.

Bartholomew II, 101 Wn.2d at 640.

In so holding, our Supreme Court declined to rely solely on the federal constitution. Contrary to Haff's assertion, however, it did not conclude that its analysis was, in fact, different under the state and federal due process clauses. Rather, the court immunized its decision from federal review by stating:

> Our decision rests on an interpretation of both the state and federal constitutions. However, the independent state constitutional grounds we have articulated are adequate, in and of themselves, to compel the result we have reached. See Michigan v. Long, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). Therefore, any decision by the Supreme Court limiting federal constitutional guaranties in a manner inconsistent with our interpretation of Const. art. 1, §§ 3 and 14 will have no bearing on our decision in this case.

Bartholomew II, 101 Wn.2d at 644. Thus, our Supreme Court was offering a conclusive prediction of the effect that a potential, future United States Supreme Court decision would have on its analysis. But the condition subsequent—the United States Supreme Court decision—was never rendered.

Haff asks us to read Bartholomew II to mean that the state due process clause is concerned with evidentiary reliability in a manner not shared by the federal due process clause. This reading is undermined by the court's repeated references to the rules of evidence as providing the necessary and appropriate

baseline of reliability. Moreover, this proposed reading is contrary to the court's holding in Vaughn, which, again, was filed on the same day. In that case, the same Supreme Court held that a trial court may assess the credibility of eyewitness identification evidence *only if* the court first finds that the police utilized unduly suggestive pretrial identification procedures. Vaughn, 101 Wn.2d at 608-09.

Bartholomew II simply holds that the rules of evidence must apply to evidence proffered by the State during the sentencing phase of a death penalty case. It is undisputed that the rules of evidence applied in the guilt phase of that trial and nothing in Bartholomew II suggests that the state due process clause required anything more. Instead, our Supreme Court was troubled only by the suspension of these rules in the penalty phase.

> It makes no sense to afford these protections to one charged with a lesser crime but then suspend them in a capital case. . . . To suspend these protections which are afforded all other criminally charged defendants at such a critical phase of a capital case is contrary to the reliability of evidence standard embodied in the due process clause of our state constitution.

Bartholomew II, 101 Wn.2d at 640. The rules of evidence sufficiently protected Bartholomew at the guilt phase of his trial. These same rules protected Haff at his trial. The decision in Bartholomew II mandated nothing more. That decision does not militate in favor of an independent state analysis of the question herein presented.

Indeed, a number of cases that predate both Vaughn and Brathwaite support the contrary conclusion—namely, that the state and federal due process clauses provide the same degree of protection in the situation presented.

First, in State v. Miller, 78 Wash. 268, 271, 138 P. 896 (1914), our Supreme Court rested on general principles in holding that a witness was properly permitted to testify that her "best judgment" was that the accused was the same man who she had testified came to her home on a prior occasion. 78 Wash. at 271. Defense counsel in that case had contended at trial that "best judgment" was not sufficient and that the witness was required to say "it is the man, or the testimony is absolutely incompetent." Miller, 78 Wash. at 271. Our Supreme Court held to the contrary, concluding, "The testimony was competent. Counsel's objection went to its weight, which was for the jury." Miller, 78 Wash. at 271.

Similarly, in State v. Spadoni, 137 Wash. 684, 243 P. 854 (1926), our Supreme Court explained that eyewitness identification testimony, so long as it is relevant and competent, is generally admissible.

> The accused complains of the admission of this testimony, because . . . it is not sufficiently definite to have any probative weight. But we are clear that no error was committed in its admission.
>
> Any evidence tending to identify the accused as the guilty person is relevant and competent. . . . Nor need the evidence be so far positive as to leave nothing but the credibility of the witnesses to be considered. Uncertainty in this respect affects only the weight of the evidence, not its admissibility . . . . [W]e have adopted the rule that on the matter of the identification of men or things, such testimony is admissible.

Spadoni, 137 Wash. at 690-91.

Additionally, in State v. James, 165 Wash. 120, 4 P.2d 879 (1931), our Supreme Court held that it is generally for the jury—and not the judge—to determine the weight of identification testimony. As the court explained:

> The jury heard the testimony as to the positive identification, and heard the witnesses say that, on the two prior occasions, they had not been positive, and it was for them to determine whether they would accept the positive identification testimony or disregard it. This court cannot weigh the testimony and hold that the jury has no right to believe and accept the evidence of positive identification.

James, 165 Wash. at 122.

Furthermore, in State v. Brown, 76 Wn.2d 352, 353, 458 P.2d 165 (1969), the defendant was identified at trial by an eyewitness who had also previously identified him in a photomontage. The defendant did not allege that there was anything improper about the initial identification procedure. Rather, he objected to the in-court identification procedure because he "was the only Negro in the courtroom." Brown, 76 Wn.2d at 353. Our Supreme Court was unmoved, holding that the State was not required to orchestrate less suggestive identification circumstances.

Finally, in State v. Gosby, 85 Wn.2d 758, 760, 539 P.2d 680 (1975), the defendants sought to exclude the testimony of an eyewitness as to the identity of the robbers and urged the Supreme Court "to established a 'base line' of reliability below which evidence must not fall in order to be admitted." Gosby, 85 Wn.2d at 760. The court refused to do so. Instead, the court adhered to the rule "that any evidence tending to identify the accused is relevant, competent, and therefore, admissible. Uncertainty or inconsistencies in the testimony affects only the weight of the testimony and not its admissibility." Gosby, 85 Wn.2d at 760.

Miller, Spadoni, James, Brown, and Gosby all predate both Vaughn and Brathwaite.

Miller, Spadoni and James predate by more than 30 years the series of United States Supreme Court decisions that culminate in the Brathwaite decision: Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); Coleman, 399 U.S. 1; Foster v. California, 394 U.S. 440, 89 S. Ct. 1127, 22 L. Ed. 2d 402 (1969); Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967 19 L. Ed. 2d 1247 (1968); and Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967).

Thus, the fourth Gunwall factor, preexisting state law, does not support a conclusion that an independent state analysis is called for.

In sum, Haff does not cite any Washington authority supporting a determination that an independent analysis of this issue under the Washington state due process clause is appropriate.[15] This conclusion is consistent with precedent. As our Supreme Court has noted, "This court traditionally has practiced great restraint in expanding state due process beyond federal perimeters. Although not controlling, federal decisions regarding due process are afforded great weight due to the similarity of the language." Rozner v. City of Bellevue, 116 Wn.2d 342, 351, 804 P.2d 24 (1991) (citation omitted). This practice can be observed in a number of cases decided since Gunwall in which the court has repeatedly rejected the argument that the state due process clause provides greater protection than its federal counterpart. See, e.g., In re Pers. Restraint of Dyer, 143 Wn.2d 384, 394, 20 P.3d 907 (2001) ("Washington's due process clause does not afford a broader due process protection than the

---

[15] Haff's citation to out-of-state or federal case law fails either because the authority cited is no longer good law (federal cases) or topically inapposite (cases construing the constitutions of other states).

Fourteenth Amendment."); In re Pers. Restraint of Matteson, 142 Wn.2d 298, 310, 12 P.3d 585 (2000) (rejecting the claim that state due process rights are greater than federal due process rights because "there are no material differences between the 'nearly identical' federal and state [due process clauses]); State v. Manussier, 129 Wn.2d 652, 679, 921 P.2d 473 (1996) ("The Gunwall factors do not favor an independent inquiry under article I, section 3 of the state constitution.").

Affirmed.

We concur:

_Dwyer, C_

_Trickey, J_

_Becker, J._