# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>MICHAEL ANTHONY BROWER,<br>aka ZILLA AYANA CROWLEY,<br>aka ZILLA BROWER, [†]<br><br>Appellant. | No.  57412-8-II<br><br><br><br>UNPUBLISHED OPINION |

LEE, P.J. — Zilla Ayana Crowley appeals her conviction for second degree murder.  She argues that this court should recognize a state constitutional right to electronically recorded custodial interrogations and hold that the trial court erred by admitting Crowley's statements to law enforcement because they were not electronically recorded.  Crowley also argues that the trial court violated her confrontation clause rights by admitting statements made by her daughter. Finally, Crowley argues that the trial court erred by imposing certain legal financial obligations (LFOs).

---

[†] On the date of the incident at issue, May 20, 2020, Zilla Ayana Crowley's legal name was Michael Anthony Brower.  During motions in limine, Crowley expressed a desire to be referred to as Zilla Crowley and that she/her pronouns be used to refer to her at trial.  Prior to trial, the parties stipulated that Crowley had identified at various time as Michael Anthony Brower, Zilla Brower, and Zilla Ayana Crowley, and that all three names referred to "the same person."  Clerk's Papers (CP) at 66.  At trial, Crowley testified that while designated male at birth, she began identifying as a female when she was young.  On June 24, 2022, Crowley legally changed her name to Zilla Ayana Crowley.  Thus, this opinion refers to the appellant as "Crowley" and quoted language is adjusted to reflect the appropriate pronouns and name.

Washington courts have declined to recognize a state constitutional right to have custodial interrogations be electronically recorded. And while the trial court erred by admitting certain testimonial statements, the error was harmless. Thus, we affirm Crowley's conviction. However, because the LFOs Crowley challenges are no longer authorized by statute, we remand to the trial court with instructions to strike the challenged LFOs from Crowley's judgment and sentence.

FACTS

A.    BACKGROUND FACTS

On May 20, 2020, Crowley called 911 to report that she had shot her wife, T.D.N.B. Medical personnel pronounced T.D.N.B. dead on the scene. Detectives Frank Frawley and Mickey Hamilton interviewed Crowley after she was detained.

The State charged Crowley in a fourth amended information with second degree murder— domestic violence and with special allegations that Crowley committed the offense within the sight or sound of her children and while armed with a firearm. Prior to trial, Crowley moved to suppress statements Crowley made to law enforcement during the investigation.

B.    CrR 3.5 HEARING

Prior to trial, the court held a CrR 3.5 hearing to determine the admissibility of Crowley's statements to law enforcement. Detectives Frawley and Hamilton testified at the hearing.

Detective Frawley testified that on May 20, 2020, he was called to assist with the investigation of a reported shooting. After Detective Hamilton arrived on scene, they both interviewed Crowley, who had been detained in a patrol car.

### 1.    Detective Frawley

Detective Frawley testified that after the detectives identified themselves and before any questions were asked, Crowley "immediately said that [s]he'd done it. 'I'll be honest. I shot her.'" 1 Verbatim Rep. of Proc. (VRP) (Feb. 9, 2021) at 15. Detective Frawley stopped Crowley and read Crowley her *Miranda*[1] rights. Detective Frawley then asked Crowley whether she understood her rights, and whether, having those rights in mind, she wished to speak to the detectives. Crowley responded "yes" to both questions. 1 VRP (Feb. 9, 2021) at 18. The *Miranda* warning, Crowley's waiver, and the interrogation were not electronically recorded.

### 2.    Detective Hamilton

Detective Hamilton testified that he was also present when Detective Frawley read Crowley her *Miranda* rights. Detective Hamilton recalled that when Detective Frawley opened the door to the patrol car, Crowley "immediately said something to the effect that 'I did it. I shot her. I'll be honest with you and I'll make this easy.'" 1 VRP (Feb. 16, 2021) at 76. Neither Detective Hamilton nor Detective Frawley asked Crowley any questions before Crowley made these statements.

Detective Hamilton recalled Detective Frawley asking Crowley whether she understood her *Miranda* rights. Crowley responded that she did and agreed to speak with them. This interaction was not electronically recorded. Also, neither detective provided Crowley with a written *Miranda* waiver.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

During cross-examination, Detective Hamilton responded "[y]es" when he was asked whether he would want to document that a person waived their *Miranda* rights, but he acknowledged that his notes from the interview did not indicate any *Miranda* waiver by Crowley. 1 VRP (Feb. 16, 2021) at 121. On redirect, Detective Hamilton explained that he did not make a note about Crowley's waiver because a waiver is so important that he would not forget about whether a waiver was made or not.

Following the detectives' testimony, defense counsel argued that absent a recording of the interrogation, there was insufficient evidence that Crowley was advised of and waived her *Miranda* rights. Defense counsel acknowledged Washington law did not support such an argument but asked the trial court to find that "there must be recording of the giving . . . and . . . waiver of *Miranda* when detectives are engaging with a person in a custodial setting and have the present ability to record." 1 VRP (Feb. 16, 2021) at 142. The trial court rejected defense counsel's argument as "not legally required." 1 VRP (Feb. 16, 2021) at 156.

Following the CrR 3.5 hearing, the trial court entered written findings of fact and conclusions of law. The court ruled that the statements Crowley made after the detectives introduced themselves to her were spontaneous and admissible at trial. The court also ruled that Crowley "was provided [her] *Miranda* rights . . . in accordance with *Miranda v. Arizona*" and, therefore, Crowley had voluntarily waived her *Miranda* rights when she made other statements. Clerk's Papers (CP) at 12. As a result, the court concluded that all of Crowley's statements to Detectives Frawley and Hamilton were admissible at trial.

4

C.    TRIAL

 1. 911 Testimony

Carrie Bowman, the 911 operator who received Crowley's 911 call on May 20, 2020, testified. The 911 call began at 7:53 PM.

During the 911 call, Crowley said her kids were "in the back room." 5 VRP (Apr. 20, 2022) at 856. When Detective Frawley responded to the scene, another officer on the scene "advised that there were four young children inside the residence." 7 VRP (Apr. 25, 2022) at 1176.

 2. Detective Kempke's Testimony Regarding P.B.'s Statements

Detective Kyle Kempke testified that he arrived at the scene of the incident around 8:15 PM, detained Crowley, cuffed her, and put her in the back of a patrol car. Crowley told Detective Kempke that her children were inside the house, so after delivering an automated external defibrillator (AED) to another officer, Detective Kempke began to secure the scene. Detective Kempke's "focus was to find out whether there was anybody else in the house." 6 VRP (Apr. 21, 2022) at 938.

As Detective Kempke searched the residence, he almost immediately ran into Crowley's 9 year old daughter, P.B. P.B. "was visibly distraught . . . crying, sobbing . . . hunched forward like her stomach hurt," and "wringing her hands." 6 VRP (Apr. 21, 2022) at 937.

At that point, defense counsel requested that the trial court address an issue without the jury present. The State then made an offer of proof of Detective Kempke's testimony regarding P.B.'s statements. During the offer of proof, Detective Kempke testified that he asked P.B. "'[w]hat happened tonight,'" and that P.B. told him:

> that mom and dad had been arguing and mom was throwing things. That woke [P.B. and her siblings] up . . . . [P.B. and her siblings] went out of the room. Dad told them to get back in the room. [P.B.] heard a loud bang. Then . . . [Crowley] was screaming at somebody on the phone.

6 VRP (Apr. 21, 2022) at 941. Detective Kempke added that as P.B. spoke, she became "shriller and shriller, more rapid fire . . . increasingly hysterical." 6 VRP (Apr. 21, 2022) at 941-42.

Detective Kempke also testified that as he spoke with P.B., he "didn't know whether this was going to end up being a crime," but that he took notes during the exchange "in case it turned out to be important later." 6 VRP (Apr. 21, 2022) at 942. Detective Kempke explained that he asked P.B. what happened to find out who was involved in the incident, whether anyone was hurt, "[b]asically an inventory of the scene." 6 VRP (Apr. 21, 2022) at 949.

In response to defense counsel's questions during the State's offer of proof, Detective Kempke clarified that he also asked P.B. how many kids were in the house. P.B. responded that P.B. and two brothers were in one room and a two-year-old sister was asleep in another room. Detective Kempke then asked P.B.'s name and P.B.'s age before asking what happened that night. Detective Kempke did not have any reason to think that any of the children were injured at the time he asked P.B. these questions. Defense counsel asked Detective Kempke whether notes were taken in anticipation of a homicide investigation, and Detective Kempke responded, "It could be, yes." 6 VRP (Apr. 21, 2022) at 943.

The State argued that P.B.'s statements were admissible because they were not testimonial and fell into the excited utterance hearsay exception. The State asserted that the primary purpose of Detective Kempke's interaction with P.B. was to respond to an ongoing emergency and that Detective Kempke asked P.B. what happened "to determine whether there were other actors in the

residence, other people on scene, other emergency situations that he should tend to." 6 VRP (Apr. 21, 2022) at 953 .

Defense counsel argued that even if P.B.'s statements were an excited utterance, they were testimonial and excludable under the confrontation clause. Defense counsel noted that Detective Kempke initiated the exchange with P.B. and took notes "because it was possible that this could be a homicide investigation." 6 VRP (Apr. 21, 2022) at 956. Defense counsel also argued that P.B.'s statements showed that P.B. was not asking for help or protection and that there was "no indication that [P.B.] was under the stress of an immediate threat of harm." 6 VRP (Apr. 21, 2022) at 957. Thus, "an objective witness of this exchange could reasonably believe that [P.B.'s] statements would be available for use at . . . trial." 6 VRP (Apr. 21, 2022) at 957.

The trial court admitted P.B.'s statements, finding they were "not . . . testimonial . . . in any way, shape or form." 6 VRP (Apr. 21, 2022) at 961. The court noted that Detective Kempke did not have a full accounting of the scene or what had happened when he arrived that night. The court also emphasized P.B.'s demeanor, stating, "It is hard to imagine a situation that is more startling and more upsetting, especially seen through the eyes of a nine-year-old." 6 VRP (Apr. 21, 2022) at 961. The court stated that P.B.'s "intent of providing information" to Detective Kempke "was to address in a child's mind the horror of what she heard that night and to tell an adult about it to protect herself and her siblings." 6 VRP (Apr. 21, 2022) at 962. Finally, the court noted that P.B.'s statements occurred only shortly after the shooting.

After the jury returned, Detective Kempke testified that P.B. told him, "'Mom and dad had been arguing and mom was throwing things. This woke us up,'" so they exited their room. 6 VRP (Apr. 21, 2022) at 973. Crowley "told them to get back in the room," and at that point, P.B. "said

she heard a loud bang and dad . . . screaming on the phone to somebody." 6 VRP (Apr. 21, 2022) at 973.

2. Detective Frawley and Detective Hamilton's Testimony

Detective Frawley testified that as soon as he and Detective Hamilton approached Crowley and identified themselves, Crowley said, "'I'll be honest. I shot her.'" 7 VRP (Apr. 25, 2022) at 1177. Detective Hamilton also testified that Crowley said, "'I shot her. I'll be honest. I'll make it easy for you.'" 7 VRP (Apr. 27, 2022) at 1281. Detective Frawley described their conversation with Crowley as "kind of . . . calm," noting that Crowley was not yelling, excited, or crying. 7 VRP (Apr. 25, 2022) at 1179.

Detective Frawley then testified that when he asked Crowley what had happened that night, Crowley told him she and T.D.N.B. had been arguing. Crowley became angry, "grabbed the weapon . . . by the handgrip . . . and . . . when [s]he grabbed it . . . the rifle went off." 7 VRP (Apr. 25, 2022) at 1190. Detective Hamilton also testified that Crowley told them she had been arguing with T.D.N.B., Crowley picked up the rifle and it went off, but Crowley did not know what happened.

Detective Frawley recalled that he commented on T.D.N.B.'s wound, telling Crowley that she had "'center-punched [T.D.N.B.].'" 7 VRP (Apr. 25, 2022) at 1193. Detective Frawley explained that by "center-punched," he meant that Crowley hit the "center" of her target. 7 VRP (Apr. 25, 2022) at 1193. Crowley responded by saying that "[s]he had great muscle memory," which Detective Frawley understood to mean that Crowley acted "without even thinking about it." 7 VRP (Apr. 25, 2022) at 1193. Detective Frawley recalled Crowley also saying, "[I]t wasn't exactly an accident." 7 VRP (Apr. 25, 2022) at 1195. Detective Hamilton also testified that he

8

recalled Detective Frawley making the center-punched comment and that Crowley responded by saying, "'Yeah, it's probably muscle memory'" or "'it's muscle memory.'" 8 VRP (Apr. 27, 2022) at 1308.

Detective Frawley asked Crowley to list the basic rules of firearm safety, and testified that after Crowley did, he told Crowley that she had "'violated all of [th]em.'" 7 VRP (Apr. 27, 2022) at 1195. Detective Hamilton testified that he also asked Crowley about the rules of firearm safety. Detective Hamilton told Crowley that "it seemed difficult to believe that somebody with [Crowley's] level of training and experience and background could disregard all of the fundamental" safety rules "and shoot h[er] wife in the center of the chest." 8 VRP (Apr. 25, 2022) at 1307. Crowley responded: "'I already told you it wasn't an accident. I intentionally pointed the rifle at her. I just don't remember it going off.'" 8 VRP (Apr. 27, 2022) at 1307.

Detective Hamilton asked Crowley whether, in light of Crowley's prior statement that she sometimes could not remember things that happened when she was angry, it was "'within the realm of possibilities that you intentionally pointed the rifle at your wife, you intentionally pulled the trigger but you just don't remember it going off?'" 8 VRP (Apr. 27, 2022) at 1308. Crowley responded by nodding and saying, "'It's certainly within the realm of possibility.'" 8 VRP (Apr. 27, 2022) at 1308. Detective Frawley also recalled Detective Hamilton asking, "[I]f in all the realm of possibilities if this was not an accident," and Crowley responding, "[I]t's possible in all the realms of possibility that this was not an accident." 7 VRP (Apr. 25, 2022) at 1195.

3.    Expert Witness Testimony

The State also called Johan Schoeman, a forensic scientist, as an expert witness. Schoeman testified that the rifle "was functional as intended by the manufacturer" and that he "did not detect

9

any defects on the firearm that c[ould] make it go off accidentally." 7 VRP (Apr. 27, 2022) at 1233. Schoeman was asked whether, "if the bolt were to release, one would still have to pull the trigger for this firearm to fire," and he responded, "Every time." 7 VRP (Apr. 27, 2022) at 1251.

4.      Defense Witnesses

a.      Firearm expert

Defense counsel called Matthew Noedel, a forensic scientist specializing in shooting incident reconstruction. Noedel testified the rifle was not mechanically flawed and "function[ed] exactly as . . . designed." 9 VRP (May 2, 2022) at 1551. Therefore, Noedel ruled out an "accidental discharge" as the cause of the shooting. 9 VRP (May 2, 2022) at 1552.

Noedel explained that giving "a sharp blow to the butt of the gun," or "jarring" it, could cause the bolt to "slam forward." 9 VRP (May 2, 2022) at 1553. Jarring could occur where someone hit the back of the rifle's buttstock. However, Noedel clarified that "just because the bolt can slam forward doesn't mean the gun will discharge at that moment. You still need to pull the trigger." 9 VRP (May 2, 2022) at 1554. He went on to explain that if someone had their finger on the trigger, "and the gun shift[ed] unexpectedly," it could cause the shooter to "flinch or . . . squeeze that trigger." 9 VRP (May 2, 2022) at 1556. Alternatively, "the momentum of the gun c[ould] cause" the shooter "to pull the trigger to the rear" and cause the rifle to fire. 9 VRP (May 2, 2022) at 1556. On cross-examination, Noedel testified that he "did not find a condition where . . . the gun would fire without pulling the trigger." 9 VRP (May 2, 2022) at 1561.

b.      Crowley

Crowley testified in her own defense. Crowley began by providing some personal background, testifying that she served in the U.S. Marine Corps for about four years. As part of

her training, Crowley learned "[b]asic marksmanship skills" and was familiar with "weapons safety."  8 VRP (Apr. 28, 2022) at 1418.  She also testified that she and T.D.N.B. had four children together.

Crowley then recounted what occurred on May 20, 2020.  She testified that the conflict with T.D.N.B. started after Crowley got her pajamas from the bedroom she shared with T.D.N.B.  T.D.N.B. became visibly upset and started yelling.  According to Crowley, T.D.N.B. "ha[d] a hard time sleeping without somebody in the room or bed with her," so Crowley grabbing her pajamas upset T.D.N.B.  8 VRP (Apr. 28, 2022) at 1441.  Crowley testified that she was not yelling herself.  Instead, Crowley tried to calm T.D.N.B. down.  According to Crowley, "[t]he discussion ended where [T.D.N.B.] stopped interacting with me at all" and focused on her phone.  8 VRP (Apr. 28, 2022) at 1445.  T.D.N.B. subsequently calmed down.

While T.D.N.B. was on her phone, Crowley "went and picked up the rifle" and "started cleaning it."  8 VRP (Apr. 28, 2022) at 1445-46.  She said the rifle went off as she reassembled it, but she did not "know how."  8 VRP (Apr. 28, 2022) at 1446.  When asked why she picked the rifle up, Crowley explained that she had been "meaning to clean . . . the tip of the barrel" because it "had gotten . . . dirty" after she used it the night before.  8 VRP (Apr. 28, 2022) at 1446.  When asked what she was doing with the rifle when it went off, Crowley said she was "adjusting the buttstock down to fully collapsed."  8 VRP (Apr. 28, 2022) at 1448.  To do so, she had to "pull a lever on the bottom and then . . . slide it forward."  8 VRP (Apr. 28, 2022) at 1448.  This motion "caused the bolt catch to be slipped and the bolt to slam forward," causing Crowley to pull the trigger.  8 VRP (Apr. 28, 2022) at 1448.

After the gun went off, Crowley panicked. She "threw down the rifle" and went to check on her children, telling them to stay where they were. 8 VRP (Apr. 28, 2022) at 1446. Crowley then called 911 and attempted to perform CPR on T.D.N.B. Once law enforcement arrived, Crowley was detained in the back of a squad car.

About an hour later, Crowley spoke with Detectives Frawley and Hamilton. She testified that her conversation with the detectives started out as a "normal nice conversation" but then turned "argumentative [and] accusatory," and that the detectives were not listening to her. 8 VRP (Apr. 28, 2022) at 1457, 1458. Crowley acknowledged telling the detectives that the shooting was not an accident, but said that she only did so "[s]arcastically." 8 VRP (Apr. 28, 2022) at 1458. When asked to explain what she meant by that, Crowley testified, "I was tired. I was exhausted. I was numb. [The detectives] weren't listening to what I was saying." 8 VRP (Apr. 28, 2022) at 1458. Crowley thought the detectives understood she was being sarcastic because of their subsequent realm of possibilities question, which Crowley characterized as an abnormal question.

Crowley acknowledged answering, "[Y]es" when asked whether "it was within the realm of possibilities that [she] intentionally pointed the firearm at [T.D.N.B.], intentionally pulled the trigger and didn't remember the gun going off?" 8 VRP (Apr. 28, 2022) at 1459, 1460. Crowley testified that she said yes "[j]ust to get it over with." 8 VRP (Apr. 28, 2022) at 1460.

Crowley also acknowledged nodding her head and saying, "[S]omething like it was probably muscle memory" when one of the detectives made the "center-punched" comment. 8 VRP (Apr. 28, 2022) at 1460. Crowley acknowledged the detective because the detective had used a military term and because she "had already told him that [she] didn't aim, didn't intentionally do

12

this." 8 VRP (Apr. 28, 2022) at 1460. Crowley stated that she did not mean to shoot T.D.N.B., and that she was surprised when it happened.

On cross-examination, Crowley responded affirmatively when the State asked Crowley whether she "told the detectives that [she] intentionally pointed the rifle at [T.D.N.B.] and that [she was] angry." 8 VRP (Apr. 28, 2022) at 1472. On redirect, Crowley reiterated that she was being sarcastic when she made that comment, that she did not mean it, and that it was not actually what happened.

5.    Closing Arguments and Verdict

During closing, the State argued that the only contested element of the crime charged was whether Crowley intended to cause T.D.N.B.'s death. The State argued that P.B.'s statement that Crowley told P.B. to go back to her room after she saw Crowley and T.D.N.B. arguing evidenced Crowley's "presence of mind to have the children leave the room," and thus her intent to kill T.D.N.B. 9 VRP (May 2, 2022) at 1609. The State also highlighted several of the statements Crowley made to the detectives as evidence of her intent to kill T.D.N.B.

Defense counsel argued that the shooting was "a tragic mistake." 9 VRP (May 2, 2022) at 1651. Defense counsel also argued that the detectives' testimonies were not reliable because they did not record their interaction with Crowley. Defense counsel further argued that Crowley's sarcastic responses to the detectives were reasonable in light of how the detectives questioned her. In fact, Crowley's admission that she was being sarcastic rendered her testimony all the more credible because "if there was any other possible explanation, wouldn't she have given it to you?" 9 VRP (May 2, 2022) at 1667. Finally, defense counsel argued that Crowley "didn't intend to kill

her wife," and asked the jury to find Crowley guilty of the lesser crime of second degree manslaughter. 9 VRP (May 2, 2022) at 1681.

The jury found Crowley guilty as charged.

D.    SENTENCING

Crowley was sentenced to 280 months' confinement: a 220 month standard range sentence with an additional 60 months for the firearm enhancement. During Crowley's sentencing hearing, the trial court imposed only "the mandatory legal financial obligations . . . because Ms. Crowley will be in custody for quite some time, and obviously there has been a financial screening that shows there are not resources." 2 VRP (Sep. 15, 2022) at 89-90. The trial court imposed a $500 crime victim penalty assessment (CVPA) and a $100 DNA collection fee.

Crowley appeals.

## ANALYSIS

Crowley argues that the failure to electronically record her custodial interrogation violated her due process rights, and therefore, the trial court erred by admitting her statements to law enforcement into evidence.[2] Crowley also argues that the trial court erred by admitting P.B.'s testimonial statements. Finally, Crowley seeks a remand to the trial court with instructions to strike the CVPA and DNA fees from her judgment and sentence.

---

[2] Crowley also assigns error to several of the trial court's CrR 3.5 findings of fact and conclusions of law, but Crowley fails to support the alleged errors with any argument, references to the record, or citations to authority. Therefore, we do not consider these alleged errors. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

A.    NO DUE PROCESS RIGHT TO THE ELECTRONIC RECORDING OF CUSTODIAL INTERROGATIONS

Crowley asks this court to recognize a right to the electronic recording of custodial interrogations under article I, section 3 of our state constitution, "enforceable through an exclusionary rule." Br. of Appellant at 38. We decline to recognize a due process right to the electronic recording of custodial interrogations and hold that the trial court did not err in admitting Crowley's incriminating statements in the absence of such a recording.

It is well established that "there is no federal constitutional right to have one's custodial interrogation recorded." *U.S. v. Meadows*, 571 F.3d 131, 147 (1st Cir. 2009), *cert. denied*, 558 U.S. 1018 (2009). However, in *State v. Gunwall*, our supreme court established six factors Washington courts use to determine whether our state constitution "extend[s] broader rights to its citizens than the United States Constitution." 106 Wn.2d 54, 58, 720 P.2d 808 (1986). Those factors are: (1) "The textual language of the state constitution"; (2) "Significant differences in the texts of parallel provisions of the federal and state constitutions"; (3) "State constitutional and common law history"; (4) "Preexisting state law"; (5) "Differences in structure between the federal and state constitutions"; and (6) "Matters of particular state interest or local concern." *Id.* at 61-62 (italicization omitted). Our courts have "traditionally . . . practiced great restraint in expanding state due process beyond federal perimeters." *Rozner v. City of Bellevue*, 116 Wn.2d 342, 351, 804 P.2d 24 (1991).

Multiple cases have held that due process does not require the electronic recording of custodial interrogations. *See State v. Spurgeon*, 63 Wn. App. 503, 508-09, 820 P.2d 960 (1991) (holding that "the Washington Constitution does not require taping of custodial interrogations"), *review denied*, 118 Wn.2d 1024 (1992); *State v. Turner*, 145 Wn. App. 899, 913, 187 P.3d 835

(2008) (holding "that *Spurgeon* controls" and that "[t]he State did not violate [the defendant's] due process rights under article I, section 3 of the Washington Constitution by failing to electronically record the custodial interrogation"), *review denied*, 165 Wn.2d 1016 (2009).

In *Spurgeon*, the court recognized that requiring police to tape custodial interrogations would represent "a sweeping change in longstanding police practice," a change that "should be made only after a full hearing of all the policy and financial implications and with adequate advance notice to law enforcement in the form of the adoption of a rule of evidence or a statute mandating recording." 63 Wn. App. at 508.

In *Turner*, the defendant "argue[d] that analysis of the fourth [*Gunwall*] factor, preexisting state law, and the sixth [*Gunwall*] factor, matters of particular state concern, support reaching a different result" than *Spurgeon*. 145 Wn. App. at 908-09. In support of the first argument, the defendant cited three state court decisions, one of which is relevant here: *State v. Davis*, 38 Wn. App. 600, 686 P.2d 1143 (1984). *Id.* at 909. The *Turner* court stated that *Davis* was not persuasive because the case did "not address the question of whether the state constitution requires police to electronically record interrogations, and were decided before *Gunwall*." *Id.*.

The *Turner* court ultimately "reject[ed] Turner's argument that article I, section 3 requires electronic recording of custodial police interrogations." *Id.* at 911. The court also explicitly agreed with *Spurgeon*'s warning that "'such a sweeping change in longstanding police practice should be made only after a full hearing of all the policy and financial implications and with adequate advance notice to law enforcement in the form of the adoption of a rule of evidence or a statute mandating recording.'" *Id.* at 913 (quoting *Spurgeon*, 63 Wn. App. at 508).

Here, Crowley argues that recent changes to the law in Washington and other jurisdictions have rendered *Spurgeon* and *Turner*'s reasoning "flawed and outdated," and urges this court to decline to follow *Spurgeon* and *Turner*. Br. of Appellant at 29. Crowley cites *Davis* and the recently enacted Uniform Electronic Recordation of Custodial Interrogations Act (UERCIA), chapter 10.122 RCW, in support of her argument.

Crowley's reliance on *Davis* is misplaced. In *Davis*, the court addressed "whether a defendant's constitutional rights are violated when the trier of fact relies upon his post-arrest silence in making a finding of guilt." 38 Wn. App. at 602. The court in *Davis* found that although the federal due process clause had been interpreted to allow comments on a defendant's postarrest silence absent a *Miranda* warning, Washington's due process clause should be interpreted to preclude such comments. *Id.* at 602-06. *Davis* is distinguishable from the instant case because *Davis* addressed comments on post-arrest silence, not the electronic recording of custodial interrogations, and *Davis* was decided before *Gunwall*. *See Turner*, 145 Wn. App. at 909 (finding defendant's reliance on *Davis* misplaced because *Davis* did "not address the question of whether the state constitution requires police to electronically record interrogations, and w[as] decided before *Gunwall*").

The UERCIA also does not support Crowley's argument. A year *after* Detectives Frawley and Hamilton spoke with Crowley, our legislature enacted the UERCIA in 2021, effective January 1, 2022. LAWS of 2021, ch. 329, § 1-24. Under the UERCIA, "a custodial interrogation, including the giving of any required warning, advice of the rights of the individual being questioned, and the waiver of any rights by the individual, must be recorded electronically in its entirety . . . if the interrogation relates to a felony crime." RCW 10.122.030(1). Where an interrogation subject to

the UERCIA is not recorded, "the court shall consider the failure to record . . . in determining whether a statement made during the interrogation is admissible, including whether it was voluntarily made." RCW 10.122.130(1). The statute expressly states that the UERCIA "does not create a right of an individual to require a custodial interrogation to be recorded electronically." RCW 10.122.180(1).

Crowley argues that while the UERCIA "enshrines recording as an aspirational best practice, it lacks enforcement mechanisms." Br. of Appellant at 35. In essence, Crowley asks this court to do what the UERCIA does not—suppress statements that are not electronically recorded.

The UERCIA requires only that a trial court consider law enforcement's failure to electronically record incriminating statements in determining the admissibility of statements. RCW 10.122.130(1). That may strike Crowley as insufficient protection, but Crowley's perceived insufficient protection does not require this court to revisit the holdings in *Spurgeon* and *Turner*.

The UERCIA appears to be a direct response to *Spurgeon* and *Turner*'s observation that it is the legislature or our supreme court in its rulemaking capacity that are best positioned to enact the kind of "'sweeping change'" that a requirement for electronic recording of custodial interrogations entails. *Turner*, 145 Wn. App. at 913 (quoting *Spurgeon*, 63 Wn. App. at 508). Requiring suppression, rather than consideration, of unrecorded interrogations and waivers still represents the kind of "sweeping change" the *Spurgeon* and *Turner* courts entrusted to the legislature and our supreme court.

Also, existing state law can weigh against recognizing expanded constitutional rights under *Gunwall* when existing state law suggests the legislature can better address the issue raised by appellant than the courts. In *Bellevue Sch. Dist. v. E.S.*, the appellant argued that our "state due

process clause is more protective than its federal counterpart" and "require[d] appointment of counsel to represent a child in an initial truancy hearing." 171 Wn.2d 695, 710, 257 P.3d 570 (2011). The appellant in *E.S.* argued that the fourth *Gunwall* factor—preexisting state law— weighed in favor of broader state constitutional protection, citing to a state statute that required appointment of counsel for minors facing involuntary commitment. *Id.* at 711. Our supreme court rejected this argument, stating, "[T]he fact that the [involuntary commitment] statute explicitly provides the right to counsel cuts against [the appellant's] argument because it shows that the legislature is capable of requiring counsel in circumstances where it deems counsel necessary." *Id.* at 711-12. Because our "legislature did not choose to require counsel in the context of an initial truancy hearing" and actually "granted discretion to the trial courts to decide whether or not counsel should be present at the initial truancy hearing," the fourth *Gunwall* factor did not support recognizing the state due process right appellant sought. *Id.* at 712, 713.

*Bellevue*'s logic applies to the instant case. The fact that our legislature addressed the electronic recording of custodial interrogations "shows that [it] is capable of requiring" electronic recordings if it wanted to, as well as deciding how to address unrecorded interrogations. *Id.* at 712. Furthermore, the UERCIA maintains the trial court's discretion to admit or suppress statements made during unrecorded custodial interrogations by requiring that the court consider the failure to electronically record "in determining whether a statement . . . is admissible, including whether it was voluntarily made." RCW 10.122.130(1). Thus, the preexisting state law Crowley cites does not support her argument; rather, preexisting state law reinforces *Spurgeon* and *Turner*'s holdings because it shows the legislature was capable of, and did, address the issue Crowley raises.

Finally, Crowley appears to argue the sixth *Gunwall* factor—matters of particular state concern—also supports revisiting *Spurgeon* and *Turner*'s holdings. Br. of Appellant at 33-35. Crowley cites the laws of several other jurisdictions that "enforce electronic recording policies through exclusionary rules or presumptions against admissibility," implying that because other states are particularly concerned about electronically recording custodial interrogations, Washington should be too. Br. of Appellant at 36. This continues to be a policy discussion of best police practices and how to enforce them, but our legislature has already decided the balance by enacting the UERCIA, so Crowley fails to establish a reason to reach a different result under *Gunwall*.

Ultimately, Crowley fails to establish any reason to depart from *Spurgeon* and *Turner*. Thus, because state due process does not require that custodial interrogations be electronically recorded, the trial court did not err in admitting Crowley's statements to law enforcement.[3]

B.      ADMISSION OF P.B.'S STATEMENTS TO LAW ENFORCEMENT

Crowley argues that the trial court erred by admitting P.B.'s testimonial statements in violation of the confrontation clause. We agree but hold that admission of P.B.'s statements was harmless error.

1.      Legal Principles

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

---

[3] We also note that Crowley stated "'I'll be honest[,] I shot her'" and "'I did it. I shot her, I'll be honest with you and I'll make this easy'" immediately after Detectives Frawley and Hamilton opened the door to the patrol vehicle and introduced themselves and before either asked Crowley any questions. 1 VRP (Feb. 9, 2021) at 15; 1 VRP (Feb. 16, 2021) at 76-77.

him." The Supreme Court has interpreted the confrontation clause to prohibit the admission of testimonial statements from absent witnesses unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). We "review confrontation clause challenges de novo." *State v. Scanlan*, 193 Wn.2d 753, 761, 445 P.3d 960 (2019), *cert. denied*, 140 S. Ct. 834 (2020).

We apply the "primary purpose test" to determine whether a statement is testimonial and thus subject to the confrontation clause's strictures. *State v. Burke*, 196 Wn.2d 712, 725-26, 478 P.3d 1096, *cert. denied*, 142 S. Ct. 182 (2021). Statements "are testimonial when the circumstances objectively indicate that . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). In contrast, "[w]hen the primary purpose of questioning is to respond to an ongoing emergency . . . 'its purpose is not to create a record for trial and thus is not within the scope of the Clause.'" *Burke*, 196 Wn.2d at 726 (quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011)). In determining the primary purpose of challenged statements, we "objectively evaluate the statements and actions of both the declarant and the individual who hears the statements in light of the circumstances in which their conversation occurred." *Id.* at 726.

Because "[l]aw enforcement officers are 'principally charged with uncovering and prosecuting criminal behavior[,]' . . . statements made to them are much more likely to be used as a substitute for trial testimony." *Id.* at 728 (quoting *Ohio v. Clark*, 576 U.S. 237, 249, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015)). However, "[t]he existence of an ongoing emergency is often an indicator that a statement to *law enforcement* (or its agents) is nontestimonial." *Id.* at 733

21

(emphasis in original). "[T]here are two ways in which an ongoing emergency may exist: first, when the crime is still in progress, and second, when the victim or the officer is in danger, either because of the need for medical assistance or because the defendant poses a threat." *State v. Koslowski*, 166 Wn.2d 409, 419 n.7, 209 P.3d 479 (2009).

In *Koslowski*, our supreme court identified four factors courts apply to "determine whether the primary purpose of police interrogation is to enable police assistance to meet an ongoing emergency or instead to establish or prove past events." *Id.* at 418. Those factors are (1) whether the speaker described current or past events; (2) whether "a 'reasonable listener' [would] conclude that the speaker was facing an ongoing emergency that required help"; (3) whether "the questions and answers show . . . that the . . . statements were necessary to resolve the present emergency or . . . show, instead, what had happened in the past"; and (4) the "level of formality of the interrogation." *Id.* at 418-19.

2.      P.B.'s Statements Were Testimonial

Here, it is uncontested that P.B. did not testify at trial and that Crowley did not have a prior opportunity to cross-examine P.B. Therefore, Crowley argues that the *Koslowski* factors "indicate that P.B.'s responses to Deputy Kempke's third . . . question, 'What happened tonight?,' are testimonial" and should not have been admitted at trial. Br. of Appellant at 41. We agree.

The first *Koslowski* factor asks, "Was the speaker speaking about current events as they were actually occurring, requiring police assistance, or w[ere] [they] describing past events?" 166 Wn.2d at 418. Courts also consider how much time passed between the events and the statements describing them. *Id.* at 418-19.

22

Here, Detective Kempke recalled P.B. describing past events: "She stated that mom and dad *had been* arguing and mom *was* throwing things. That *woke* [P.B. and her siblings] up," etc. 6 VRP (Apr. 21, 2022) at 941 (emphasis added). In *Koslowski*, the court noted that the victim described past events and that the record did not indicate that the perpetrators "might return" or that she was still in danger from them. 166 Wn.2d at 422. The same is true here: Detective Kempke had already handcuffed and secured Crowley in the back of a patrol vehicle, so he was aware that Crowley was no longer a threat to anyone on the scene. *See State v. Ohlson*, 162 Wn.2d 1, 15, 168 P.3d 1273 (2007) ("[T]he critical consideration is not whether the perpetrator is or is not at the scene, but rather whether the perpetrator poses a threat of harm, thereby contributing to an ongoing emergency."). Furthermore, while Detective Kempke testified that, when he spoke to P.B., he did not know who else might be in the home, there was no indication that anyone was present besides law enforcement, P.B., and P.B.'s siblings.

As to timing, the 911 call began at 7:53 PM, and Detective Kempke testified that he arrived on the scene at 8:15 PM. Detective Kempke also testified that before he encountered P.B., he contacted Crowley, detained her in the back of his patrol vehicle, and brought an AED to another deputy. In other words, at least 22 minutes elapsed between the shooting and P.B.'s statements. This is significantly longer than the less than five minutes that elapsed between the 911 call and officer response in *Ohlson*. *Id.* at 17. Thus, it cannot be said that P.B.'s "statements were made contemporaneously with the events described," as they were in *Ohlson*. *Id.* Accordingly, the first *Koslowski* factor weighs in favor of finding that P.B.'s statements were testimonial.

The second *Koslowski* factor asks, "Would a 'reasonable listener' conclude that the speaker was facing an ongoing emergency that required help?" 166 Wn.2d at 419. In *Koslowski*, the court

23

noted that "a reasonable listener would conclude that the danger had passed" because, despite the victim's frightened state, her "statements were made after police had arrived," and no evidence indicated she faced further danger. *Id.* at 423. The same is true here: P.B. spoke to Detective Kempke after he arrived on scene, and after Crowley had been removed from the house. P.B. told Detective Kempke where the other children were and did not indicate that any of the children were injured. While P.B. was clearly upset, nothing in the record indicates P.B. faced a future threat from Crowley or anyone else on the scene; an emergency cannot be inferred based solely on P.B.'s emotional state. *See id.* at 424 ("[I]n some cases an individual's emotional state could also be more reflective of the individual person's own emotional nature than indicative of an ongoing emergency.").

P.B.'s "increasingly hysterical" demeanor does not necessarily indicate the presence of continuing danger. 6 VRP (Apr. 21, 2022) at 942. P.B. never asked Detective Kempke for help, and, as noted above, Detective Kempke knew Crowley was already detained and secured in the patrol car. Furthermore, there is no indication that P.B.'s emotional state made it difficult for P.B. to answer Detective Kempke's questions. Thus, the second *Koslowski* factor weighs in favor of finding that P.B.'s statements were testimonial.

The third *Koslowski* factor asks, "What was the nature of what was asked and answered? Do the questions and answers show, when viewed objectively, that the elicited statements were necessary to resolve the present emergency or do they show, instead, what had happened in the past?" 169 Wn.2d at 419. In assessing the third factor, the *Koslowski* court noted:

> [I]nitial inquiries at the scene of a crime might yield nontestimonial statements when officers need to determine with whom they are dealing in order to assess the situation and the threat to the safety of the victim and themselves. But it is

24

irrelevant that the statements were responsive to 'initial inquiries' unless the statements were a cry for help in the face of an ongoing emergency or the statements provided information that would enable officers immediately to end a threatening situation.

*Id.* at 425-26 (internal citations omitted).

Here, P.B.'s response to Detective Kempke's question about what happened were neither "a cry for help" nor did they "provide information that would enable" Detective Kempke to address "a threatening situation." *Id.* at 426. Detective Kempke testified that he did not have any reason to think that any of the children were injured at the time he questioned P.B. And while Detective Kempke's initial questions about how many children were in the house and P.B.'s age and name provided Detective Kempke with valuable information about who was on the scene, asking P.B. what happened elicited no information indicating an ongoing emergency. P.B. did not state she or her siblings were hurt, she did not indicate that anyone else was in the home, nor did she indicate that there was an active threat to her or the officers' safety. Moreover, the fact that Detective Kempke took notes indicates that the question and P.B.'s response to the question about what happened was not intended to address an emergent situation. Accordingly, the third *Koslowski* factor weighs in favor of finding that P.B.'s statements were testimonial. *See id.* ("There is no evidence suggesting that police would encounter a violent individual at the residence and no evidence that the defendant or [other perpetrators] were still in the vicinity.").

The fourth *Koslowski* factor asks, "What was the level of formality of the interrogation? The greater the formality, the more likely the statement was testimonial." *Id.* at 419. In *Koslowski*, the court noted that the victim's "emotional state caused the interrogation to be less formal," and that "questioning [the victim] at her home was certainly less formal than the police station." *Id.* at

25

429. The same is true here: Detective Kempke asked P.B. what happened in her home. Accordingly, the fourth *Koslowski* factor weighs against finding that P.B.'s statements were nontestimonial.

On balance, it is clear that, when Detective Kempke asked P.B. what happened, the primary purpose was not to address an emergent situation but to memorialize P.B.'s statements about the night's events in case they were needed for a later criminal prosecution. In fact, Detective Kempke admitted he took notes of what P.B. said "in case it turned out to be important later." 6 VRP (Apr. 21, 2022) at 942. Furthermore, when defense counsel asked whether Detective Kempke "took notes because [he] thought it could potentially be a homicide investigation," Detective Kempke responded, "It could be, yes." 6 VRP (Apr. 21, 2022) at 943. And while it is true that Detective Kempke did not have a full "inventory of the scene" when he arrived, by the time he asked P.B. what happened, he knew that Crowley had been detained and secured, he knew where the children were, and he had no indication that anyone other than T.D.N.B.—who was being attended to by another deputy—was hurt. 6 VRP (Apr. 21, 2022) at 949. Thus, we hold that P.B.'s statements made in response to Detective Kempke's questioning were testimonial, and that the trial court erred by admitting P.B.'s statements in violation of Crowley's confrontation clause rights.

3. Harmless Error

Admission of testimonial statements in violation of the confrontation clause is subject to a harmless error analysis. *Burke*, 196 Wn.2d at 738-39. "The test for whether a constitutional error is harmless is whether the untainted evidence of the defendant's guilt is so overwhelming that it necessarily leads to the same outcome." *State v. Mayer*, 184 Wn.2d 548, 555, 362 P.3d 745 (2015). The State must prove harmless error beyond a reasonable doubt. *Burke*, 196 Wn.2d at 739.

At trial, the only element of second degree murder that was at issue was intent.[4] Thus, we must determine whether the untainted evidence of Crowley's intent to kill T.D.N.B., and the evidence that Crowley committed the act within the sight or sound of her children, was so overwhelming that the jury would still have convicted Crowley without hearing P.B.'s statements.

Here, P.B.'s statements would not have affected the outcome of the trial because there was overwhelming evidence of Crowley's intent to kill T.D.N.B. First, both gun experts testified that Crowley's rifle would not have gone off unless Crowley pulled the trigger, suggesting that Crowley in fact pulled the trigger to kill T.D.N.B.

Second, Crowley acknowledged, during both direct and cross-examination, that she said "something like it was probably muscle memory" when Detective Hamilton commented on the placement of T.D.N.B.'s wound. 8 VRP (Apr. 28, 2022) at 1460. A chest wound is likely to be fatal; therefore, the placement of the wound suggests Crowley intended to kill T.D.N.B.

Third, and most important, Crowley acknowledged the intentionality of her actions at trial. During direct examination, Crowley acknowledged both telling the detectives that the shooting was not an accident and answering, "[Y]es" when asked whether "it was within the realm of possibilities that [she] intentionally pointed the firearm at [T.D.N.B.], intentionally pulled the trigger and didn't remember the gun going off?" 8 VRP (Apr. 28, 2022) 1458, 1459-60.

---

[4] "A person is guilty of murder in the second degree when: . . . With intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person." RCW 9A.32.050(1)(a). The jury was instructed that "[a] person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime." 9 VRP (May 2, 2022) at 1586; CP at 108.

Similarly, P.B.'s statements would not have affected the outcome of the presence of children aggravator. Several witnesses testified that Crowley's children were at the scene on May 20, 2020. For example, during the 911 call, Crowley told the operator that her kids were "in the back room." 5 VRP (Apr. 20, 2022) at 856. Detective Kempke also testified that he observed at least one child in the home. Detective Frawley testified that as he made his way to the scene he was "advised that there were four young children inside the residence." 7 VRP (Apr. 25, 2022) at 1176. Accordingly, the untainted evidence overwhelmingly shows that Crowley's children were inside the residence and within sight or sound of the shooting on May 20, 2020. Therefore, the admission of P.B.'s testimonial statements was harmless error.

C.     LFOs

Crowley argues that the CVPA and DNA collection fee should be stricken from her judgment and sentence. The State does not oppose a remand for that purpose.

Effective July 1, 2023, RCW 7.68.035(4) prohibits courts from imposing the CVPA on indigent defendants. *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048, *pet. for rev. filed*, 102378-2 (2023). Also effective July 1, 2023, the DNA collection fee is no longer statutorily authorized. LAWS OF 2023, ch. 449, § 4; RCW 43.43.7541(2). Although these amendments took effect after Crowley's sentencing, they apply to cases pending on appeal. *Id.*; *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018) (holding that amendments to our state's LFO statutes apply to cases pending on direct appeal when the law took effect).

Here, the trial court imposed a $500 CVPA fee and $100 DNA fee on September 15, 2022, after finding that "there has been a financial screening that shows there are not resources." 2 VRP

No. 57412-8-II

(Sep. 15, 2022) at 89-90. Accordingly, we remand Crowley's judgment and sentence to the trial court with instructions to strike the $500 CVPA and $100 DNA collection fee.

CONCLUSION

There is no state constitutional right to the electronic recording of custodial interrogations; therefore, although Crowley's statements to law enforcement were not electronically recorded, the trial court did not err by admitting those statements. Also, the admission of P.B.'s testimonial statements was harmless error. Therefore, we affirm Crowley's conviction. However, we remand to the trial court with instructions to strike the CVPA and DNA fee from Crowley's judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, P.J.

We concur:

Glasgow, J.

Che, J.

29